535 So.2d 870 (1988)
STANDARD ROOFING COMPANY OF NEW ORLEANS
v.
ELLIOT CONSTRUCTION COMPANY, INC., et al.
No. 87 CA 0506.
Court of Appeal of Louisiana, First Circuit.
August 22, 1988.
As Amended November 30, 1988.
Writs Denied February 17, 1989.
*872 Jack Alltmont, New Orleans, for plaintiff-appellant Standard Roofing Co. of New Orleans.
Douglas Kewley, Metairie, for third party plaintiff-appellant Celotex Corp.
John C. Miller, Baton Rouge, for third party defendant-appellant August Perez and Associates.
Gordon A. Pugh, Baton Rouge, for defendant-appellant Elliott Const. Co.
Daniel Atkinson, Baton Rouge, for third party defendant-appellant U.S. Fidelity and Guar. Co.
Robert E. Redmann, New Orleans, for defendant-appellee State of La.
Ben Lightfoot, Baton Rouge, for defendant-appellee National Gypsum Co.
Before WATKINS, CARTER and FOIL, JJ.
CARTER, Judge.
This is a suit arising from a defective roof installed pursuant to a construction contract. Plaintiff, the roofing subcontractor, appeals the trial court's decision requiring it to pay $309,044.00 to the general contractor and dismissing its third party demands.
The parties to the appeal are: (1) the State of Louisiana (State), the owner of the building under construction; (2) Standard Roofing Company of New Orleans, Inc. (Standard), plaintiff and roofing subcontractor; (3) August Perez and Associates, Inc. (Perez), the project architect; and (4) Celotex Corporation (Celotex), the supplier of the roofing system. Elliot Construction Company (Elliot), the general contractor, also appealed, but then settled its claims with Standard and Standard's surety/insurer, United States Fidelity and Guaranty Company (USF & G). Elliot and USF & G assigned to Standard all rights on appeal against third parties.
The State contracted with Elliot, as general contractor, and Perez, as architect, for the construction of the Community Educational Assembly and Athletic Center (minidome) on the Baton Rouge campus of Southern University. Elliot subcontracted with Standard to provide the labor and materials necessary to install the roofing system on the domed roof. Standard purchased the roofing system materials specified in Perez's plans and specifications from Celotex.
After Standard applied the recommended roofing system to the major portion of the domed roof, Perez rejected Standard's work for failure to follow plan specifications. The rejection was based on two problemsthe roof's failure to be watertight and its wrinkled appearance.
A second roofing subcontractor was hired and applied Celotex's roofing system following all plan specifications. Prior to completion, it became apparent that the second roof, although watertight, also had an unacceptable wrinkled appearance. After changes were made in installation procedures, the roof's appearance was deemed acceptable, and it was completed.
Initially, Standard sued Elliot and Aetna Casualty and Surety Company (Aetna), the insurer of Elliot's construction bond, for the $81,886.60 balance allegedly due under its roofing subcontract. Elliot reconvened against Standard and the State seeking damages based on the necessity of replacing the first roof and the associated delays. Standard filed third party demands against the following parties: (1) the project architect, Perez; (2) National Gypsum, the manufacturer of the roof decking referred to as tectum; (3) Celotex, the supplier of the roofing system; and (4) the State. Elliot filed a reconventional demand against Standard and USF & G and third party demands against: (1) the State; (2) National Gypsum;[1] and (3) Celotex. Perez filed a third party demand against the State and Celotex. Numerous other demands were filed by the various parties.
The district court rendered judgment against Standard and in favor of Elliot in the amount of $309,044.00 for damages caused by Standard's breach of the roofing subcontract. USF & G was found solidarily *873 liable with Standard for the limits of its performance bond. The claims against all other parties were dismissed. Standard appeals the judgment in favor of Elliot, as well as the dismissal of its original action and third party demands.[2] Standard is also asserting the rights of Elliot and USF & G obtained through assignment, against the State and Celotex. Standard seeks to recover in whole, or in part, the amounts for which it was cast by the trial court, together with the amount allegedly due under its subcontract. Additionally, Standard seeks reimbursement of attorney's fees and costs from Celotex based upon the redhibitory defects in the roofing system.
The issues on appeal are as follows:
(1) The parties responsible for paying the costs incurred in replacing the roof and the basis of that responsibility;
(2) The damages incurred in replacing the roof; and
(3) Standard's right to reimbursement for attorney's fees and costs from Celotex under the theory of redhibition.

FACTS
In February of 1972, the State of Louisiana, through the Capital Outlay Budget Board, Division of Administration, (State) entered into a contract with Elliot for the construction of the minidome. The minidome was described by the trial judge in his written reasons for judgment as follows:
The Mini-Dome is a large circular building. The dome affect (sic) is created by the roof structure. It consisted of thirty-two (32) metal beams, also referred to as ribs or rib beams. These beams extended from a tension ring just below the top of the interior side of the exterior wall upwards to a compression ring at the top of the dome. A series of metal purlins between each rib lent lateral support to the rib beams and the two constituted the frame work upon which the decking and the roofing material were to be placed.
The rib beams each consisted of six sections fabricated end to end to give the beam the desired arch. With the beams all in place and viewed from the top, the corresponding end of each section of each beam formed a series of rings and were referred to as such. There were seven such rings, commencing with the compression ring at the top (Ring 1) down to the end of the last section of the beam at the interior wall (Ring 7). The area at Ring 7 and the interior wall throughout the circumference of the building was referred to as the valley. The area between each rib beam was referred to as a bay of which there were thirty-two (32). At the bottom of the alternate bays were located downspouts. The roofing material was installed in horizontal fashion in each bay from the bottom of the dome to the compression ring.
According to Perez's plans, a product known as "tectum" was laid on top of the beams and purlins by Elliot to form the roof deck. Tectum, which is manufactured by National Gypsum, is a composite board, resembling shredded wheat, and composed of shredded wood-type material compressed into boards and cemented together. It is approximately three inches thick and, as per the dome plans, came with a factory-applied felt (roofing paper) on what was to be its outer surface.
Standard was then to glue the roof covering, known as "Chem-Ply," to the tectum's factory-applied felts in horizontal strips with an epoxy adhesive. Chem-Ply, which is manufactured by Celotex, is a white, vinyl-like sheet material with a foam-backing. It was purchased and provided by Standard.
While the minidome was in the design phase, a representative of Celotex contacted Perez and suggested the use of Chem-Ply over a tectum base for the roof of the minidome. The correspondence further touted Chem-Ply's performance in handling expansion, contraction, and other distortions affecting roofing systems. This system was subsequently adopted by Perez, and Celotex's representative worked *874 with Perez in arriving at an overall specification for the deck assembly.
The job specifications called for the contractor to obtain from Celotex a roofing surface guarantee or bond under which Celotex would guarantee against defects of materials and workmanship and maintain the roof in a watertight condition for ten years. As a result, Celotex had to be satisfied with the quality of the materials and workmanship so that it would ultimately issue the bond.
Elliot began construction on the minidome in March, 1972. Standard was not called to begin work on the job until the summer of 1974. An initial meeting was held on May 30, 1974, and attended by representatives of Elliot, Standard, and Celotex. At that meeting it was noted that Elliot had stored about 25% of the tectum directly on the ground, covered with visqueen. The substantial humidity underneath the visqueen had caused the loosening and wrinkling of the factory-applied felt on some of the tectum. All parties agreed that the tectum could not be used in its deteriorated condition.
Celotex advised that the tectum should be replaced or that the wrinkled, factory-applied felt should be removed and a continuous base sheet of # 33 coated felt applied to the tectum with an SIS adhesive.[3] The Chem-Ply would be applied to the base sheet with an epoxy adhesive. Celotex further noted that the base sheet would protect the tectum, as well as minimize surface irregularities. See Appendix A attached. Standard submitted an additional cost estimate for $14,050.00 to apply the continuous base sheet, and Elliot paid for the additional work.
On July 23, 1974, Standard commenced work on the job. At that time, Elliot had already laid tectum in eight bays. Standard split its crews into two groupsone to apply the base sheet to the tectum and one to apply the Chem-Ply to the base sheet. Elliot decided to leave open the compression ring, a twenty (20) foot diameter circle in the center of the dome, for light and ventilation purposes.
The trial judge described the method of applying the Chem-Ply as follows:
The Chem-Ply arrived in boxed rolls. It is 36 inches wide and generally 71 feet in length, although some Chem-Ply arrived in varying lengths. The foam backing covers only 34 inches leaving two inches for overlapping of the previously laid sheet. The overlapping edge is referred to as the selvage lap. There is no overlapping of the Chem-Ply where the end of one sheet joins the end of the next sheet. These are referred to as butt joints. Once the Chem-Ply is laid over the field epoxy, a "Tarzan" roller is used to add the necessary pressure to secure full adhesion between the foam backing and the epoxy-coated base sheet. A caulking adhesive is used to seal the selvage laps and to adhere a four inch flashing tape over the butt joints. The selvage lap is wiped clean of any foreign material with a special solvent, allowed to dry, the caulking adhesive is applied beneath a two inch lap with a gun designed for this purpose, and the lap rolled with a wallpaper roller to insure complete embedment. The four inch flashing tape is adhered to the butt joints in similar fashion. After the entire roof is covered, it is mopped with a surface coating to remove any marks and to give it a fresh appearance. This surface coating material has no waterproofing capacity.
On August 6, 1974, the application of the Chem-Ply roofing was about 55% completed. Ron Pilgrim, the Construction Administrator for Perez, stated in his report for that day that the quality of the installation did not appear acceptable and made references to wrinkles in the Chem-Ply. He further indicated that the Chem-Ply roofing material was being stored on the roof *875 by Standard and was subjected to constant wettings by rains, even though the job specifications required that it be stored in a dry, cool place.
A report of Joel Grayson of the Facility Planning and Control Department of the State, dated August 14, 1974, also indicated that workmanship on the roof seemed to be lacking and that there were many "ridges, wrinkles and areas not glued down." By that date, Standard had roofed 29 of the 32 bays.
On August 29, 1974, a roof inspection meeting was held on the roof to discuss specific problems, including: (1) bulging base sheet at the tectum joints; (2) water trapped under Chem-Ply roofing; and (3) Chem-Ply being installed in a wet condition. The parties viewed workers rolling the Chem-Ply seams in an effort to force out the water underneath. Standard's representative contended that the expanding tectum was causing the bulging of the newly applied felts at the tectum joints.
Celotex's representative, Coleman Curtis, stated that the water under the Chem-Ply would continue to evaporate at the open-end seams and that the remaining water would be released if the selvage seams were turned back, dried and sealed. He further indicated that the balance of moisture left in the Chem-Ply would be vented to the interior of the structure "because of the nature of the felts." He felt that the water was not a problem and disputed that the Chem-Ply was being installed while the back foam was wet.
Celotex and Standard's representatives asked that they be allowed to finish the job before any final decision was made regarding rejection of the roof. Perez responded that the job would continue, but that the roof would not be accepted with the various bulges and wrinkles.
On September 4, 1974, Perez's representative notified Elliot that it was withholding payment of $47,509.00 related to roof work. On September 13, 1974, Elliot informed Standard that payment would not be forthcoming until "a resolution of the existing problem with your work is reached."
On September 19, 1974, Ron Pilgrim and Robert Landry (Perez), Charles Peterson (Standard), Pete Torrence (Elliot), and Coleman Curtis (Celotex) inspected the roof. Pilgrim made the following notations in his report: the roof was still unsatisfactory; there was a large bubble under the roofing about 2' X 2' in size; the tectum was flat but the base sheet had buckled; there was very little adhesion between the felt and tectum; inspection holes showed moisture trapped in the tectum and on the underside of the Chem-Ply. The group resolved that Standard would remove the ridges in the roof in a sample area by cutting them out and patching the Chem-Ply roofing over the cutout portions. That area would then be reinspected.
On September 23, Pilgrim noted a number of places where brownish water was seeping from between the horizontal laps and trickling down the surface of the roof. He further noted that the joints in the valley were in poor conditionloosening and cracking. The condition of the roof in September was substantiated by the testimony of Robert Landry, a field representative for Perez, and Ronald Robert, whose company was employed by Elliot to expedite the minidome project.
On September 25, 1974, another meeting was held with representatives from the State, Elliot, Standard, Celotex and Perez. Elliot instructed Standard to make an official reply as to what action it and/or Celotex would take to resolve the problems.
Following the meeting, Standard asked Celotex for technical information with which it could respond to Perez's objections. W.W. LeGrow of Celotex responded that he would obtain technical assistance and also noted, referring to the wrinkles, that Chem-Ply always follows the outline of the substrate to which it is attached.[4] He further stated that the completed coated *876 sections of the roof looked good from the ground.
On or about October 4, 1974, Perez confirmed the rejection of the roof due to Standard's failure to follow application specifications. It required that corrective action be taken by October 15, 1974, and continued until the roof was made acceptable. Standard did not man the job after October 2, 1974, and responded to the rejection with correspondence indicating that the problem was with the "deck under-layment" rather than its work. It further stated that the roof was applied in accordance with specifications, Celotex found it had met all bonding requirements, and Elliot was in default of its contract with Standard.
A final effort to resolve the problem was made at a meeting held on November 13, 1974. Standard's representative stated that it would cut out the wrinkles at the joints to resolve the problem with the Chem-Ply's appearance. The State, Perez, and Elliot agreed to give Standard the opportunity to correct the problems.
Following the meeting, representatives from the State, Celotex, Perez, Elliot, and Standard inspected an area where the joints had previously been cut, the base sheet removed, and the Chem-Ply glued directly to the tectum. Those joints remained in acceptable condition. The joints covered by base sheet and Chem-Ply continued to bulge upward. The State's representative indicated that if all bulges were cut, the entire roof would be patched at the perimeter of every tectum sheet. The State decided it would not accept a new roof which was patched to that extent.
On November 15, 1974, Perez formally notified Elliot that the roof remained unacceptable and that the proposed cutting and patching of the vertical wrinkles would not render it acceptable. The notice further stated that the building continued to sustain damage as a result of water entering at various points. Elliot advised Standard of that decision on November 21, and Standard never returned to the job.
In December, 1974, Elliot closed the compression ring with tectum and covered the tectum with visqueen and/or loose roofing paper held down with boards and other items. Standard then offered to complete the roof by applying Chem-Ply in the compression ring area. However, Standard's offer was rejected, and Standard filed suit.
In a report dated December 24, 1974, Robert Landry (Perez) reported as follows:
The majority of the dome roof has been rejected because of wrinkles, there are some possible leaks in the sloped portion of the roof however the main problem as far as water entering the building is at the valley where the lapjoints of the Chem-Ply were made when the material was yet (sic), there was poor adhesion and there are, consequently, leaks.
In his reports of January, February, and March, 1975, he noted that the temporary visqueen covering over the compression ring was leaking substantially and raised the possibility that water was running into the old tectum.
Elliot, meanwhile, hired Logan Donnel, an engineer specializing in roof problems. Mr. Donnel first visited the job site on March 4, 1975, in an attempt to find a solution that would satisfy the requirements of Elliot, the State, and Perez and meet the bonding requirements of Celotex. He was informed that the roof had been rejected due to its appearance and that there were concerns regarding the ability to make the roof watertight.
Mr. Donnel found as general and typical conditions throughout the roof surface unsealed laps, water entrapped between the Chem-Ply and the base sheet, delamination of foam backing, and wrinkles along the tectum joints. He made seven test cuts at various areas of the roof and in each one found that there was water in the foam backing of the Chem-Ply. The adhesion of the base sheet to the Chem-Ply varied from good to nonexistent. In his opinion, the variations in the adhesion indicated improper workmanship.
The area underneath the valley contained the most serious leaks, but there were other isolated spots in the dome itself and minor leaks around the compression ring.
*877 He felt any attempt to correct the superficial defects, such as sealing laps, would result in further deterioration and delamination. He concluded that the tectum decking remained in satisfactory condition, but the existing base sheet and Chem-Ply would have to be removed and replaced. Donnel felt that significant, systematic wrinkling around the tectum edges was inevitable due to the design useda base sheet adhered to tectum.
Standard hired its own expert, W.J. Evans, in April, 1975. He initially inspected the roof on May 12, 1975, and found the valley to be in poor condition with standing water and some debris. He estimated that there were fifteen to twenty laps on the domed portion of the roof which were not completely sealed and were emitting water.
On July 18, 1975, he made his first comprehensive inspection of the entire roof. After an additional inspection on August 7, Evans concluded that the principal problems were in the valley and could be corrected and that it was possible and practical to repair the roof and restore it to worthwhile service.
In September, 1975, Evans was present during the removal and replacement of Standard's roof. He saw considerable water and moisture at the top of the roof and more than he expected in the roof's sloping sides. He testified that as the workers progressed down the roof, the amount of moisture coming off with the materials was increasing until they reached the bottom of the roof where the materials were actually wet.
Evans opined that inadequately or improperly sealed laps could not have caused the amount of moisture he saw in the initial roof. He theorized that the moisture resulted from water vapor rising from the building, through the tectum, and condensating on the underside of the Chem-Ply. Both experts agreed that the open compression ring, except for its immediate area, was not the source of the moisture found beneath the Chem-Ply in the remaining areas of the roof's surface.
Meanwhile, Elliot was looking for a subcontractor to re-roof the minidome. On June 30, 1975, Elliot contracted with Sechrist-Hall Company of Corpus Christi, Texas (Sechrist-Hall), to perform that service.
A preconstruction meeting for the re-roofing project, attended by all parties to this suit except Standard, was held on September 17, 1975. The parties discussed the plan for the application of the new roof under which all of the felts and Chem-Ply on the dome were to be removed. Elliot was responsible for repairing and replacing any damaged tectum.
Celotex recommended the application of a parge coating to smooth the bare tectum, followed by SIS adhesive and a base sheet. The recommended base sheet, unlike the one applied by Standard, was non-organic felt and was heavier and made of a better quality. Celotex stated the new base sheet was also less susceptible to dimensional changes. After application, the base sheet was to remain uncovered for one week, by Celotex's orders, to allow the adhesive solvents to dissipate. Sechrist-Hall was then to apply the Chem-Ply using an epoxy adhesive and to seal all laps at the end of each day.
At the meeting, Celotex's production manager stated that the base sheet was needed because it provided a temporary roof to protect the tectum until the Chem-Ply was applied, that it provided a permanent two-ply, rather than one-ply system, and that it smoothed out existing irregularities in the deck thereby providing a superior finished aesthetic effect.
On September 23, 1975, Sechrist-Hall commenced the re-roofing job. After the application of Chem-Ply to two and one-half rings, wrinkles began to appear on the new roof despite Sechrist-Hall's undisputed exemplary workmanship. On October 21, Sechrist-Hall was told to suspend the work until the problem could be resolved.
In an attempt to remedy the problem, Perez instructed Sechrist-Hall to cut the base sheet in a sample area at each horizontal and vertical joint of the tectum boards, thereby creating a gap in the base sheet outlining each board. Pursuant to *878 Perez's instructions, the Chem-Ply was glued directly to the tectum in the gap. On November 7, the test area was deemed acceptable by Perez and the State, and on November 21, Sechrist-Hall was allowed to resume its work. The design change proved satisfactory, and the second roof was completed on February 2, 1976.
There were several significant changes in the re-roofing procedure, besides the cutting of the base sheet and the addition of the parge coating and non-organic, higher quality base sheet. Those changes included: (1) increasing the slope in the valleys to correct the problem of standing water; (2) adding a double layer of roofing paper over the concrete in the valley to protect the Chem-Ply from moisture in the concrete; (3) the use of an epoxy adhesive under the base sheet in the deck of the valley; and (4) application of the roofing system while the air conditioner was on, which reduced the amount of humidity in the air.[5]
During the construction of the minidome, Celotex was having problems with Chem-Ply on other jobs. Due to abnormally high complaints, in 1974 the research department of Celotex's parent company began investigating the problems. Research memoranda from 1974 indicate that insufficient manufacturing processes resulted in premature delamination of the foam backing and a shortened lifetime or resiliency. As a result of the studies, in March of 1975, Celotex agreed to withdraw the entire Chem-Ply system from the market. Cekotex manufactured a special order for the re-roofing project.

TRIAL COURT'S DECISION
The trial court rendered judgment in favor of Elliot and against Standard in the amount of $309,044.00.[6] The award was made up of the following specific items:

(1) Remove roofing and
 repair deck $ 25,453.00
(2) Sub-contractor's
 charge to replace
 the roof $138,589.00
(3) Roofing consultants $ 17,581.00
(4) Painting tectum
 deck $ 19,247.00
(5) Time related costs $108,174.00

USF & G was found to be liable in solido with Standard for $141,000.00 of the total liability, the limits of its performance bond. All other claims and demands were dismissed.
In detailed written reasons, the trial court found that Perez and the State were justified in rejecting the roof on the basis of Standard's poor workmanship and that Standard was obligated to make the roof watertight, if possible, before walking off the job.
The trial court accepted the opinion of Logan Donnel, Elliot's expert, that the improperly sealed laps and butt joints were the cause of the high moisture content found under the Chem-Ply and the roof's failure. It further found that Standard's job foreman had no prior experience with Chem-Ply, did not have access to a Chem-Ply application manual, failed to see that selvage laps and butt joints were properly and promptly sealed, and was of the mistaken belief that the adhesive used to attach Chem-Ply would render the laps and joints watertight.
The court concluded that it need not resolve the issue regarding the State's and/or Perez's prerogative to decline acceptance of Standard's work on the basis of aesthetic grounds, even though there "may be some merit in Standard's claim that it was not responsible for the wrinkles." The court further concluded that it need not address Elliot's claim against Celotex for any breach of express or implied warranties because the wrinkles did not produce the leaks.

*879 LEGAL ANALYSIS
We agree with the trial court's finding that poor workmanship by Standard was a cause of the leaking dome roof and that Standard should have made the roof watertight, to the extent possible, before leaving the job in October, 1974. While conflicting testimony was presented on the severity of the leaks in the roof and whether the roof could be repaired rather than replaced, there is sufficient evidence to support the finding that Standard was responsible for the waterproofing problems in the sloped portion of the domed roof and that its substandard performance contributed to the leaks occurring in the other areas of the roof.
The overwhelming majority of the testimony indicates that the most severe leaks occurred in the valley. The valley is located where the tectum roof reaches the wall at a steep angle. It was leveled out by the application of a wedge of lightweight aggregate concrete which was placed at the joint between the wall and the roof.
Standard's failure to promptly and properly seal laps, its use of wet materials, and its improper storage of the Chem-Ply all contributed to the leaks in the valley. However, there was substantial evidence that those leaks were attributable, at least in part, to the fault of Perez and Elliot.
The wedge of concrete in the valley formed a slope which peaked midway between the drains located in every other bay. The slope, as designed by Perez, was inadequate for proper drainage, resulting in standing water in the valley area. During the re-roofing procedure, Sechrist-Hall added more concrete to the valleys to increase the slope and improve the drainage.
Donnel and Evans testified that Perez's flashing detail along the entire perimeter of the roof was faulty and allowed the leakage of water under the Chem-Ply. The same design detail was used on the re-roofing project and both experts, after visiting the minidome in 1976, reported that the valley still leaked.
Perez's specifications also required that the Chem-Ply be applied directly over the concrete wedge. According to the expert testimony, the water in the concrete evaporated causing adhesion problems with the Chem-Ply. The design was changed on the re-roofing project to provide for a double layer of felt paper over the concrete to protect the Chem-Ply.
Elliot made a construction error when pouring the concrete for the gutters. The specifications stated that the factory-applied felts were to be removed from the top of the tectum before the concrete was poured. Mr. Donnel testified that this step was important to allow the proper curing and drying of the concrete. However, Elliot did not remove the felts before pouring the concrete. The water in the concrete was trapped between two vapor barriers and, in Donnel's opinion, was the cause of some of the problems relating to the sealing of laps in the valleys.
The preponderance of the evidence supports the trial court's finding that Standard's substandard work performance was the primary cause of the leaking roof and resulted in the replacement of the entire roof. While Perez's design defects and Elliot's construction defect contributed to the problems in the valley, these defects, in themselves, were not severe enough to require the replacement of the entire roof. Additionally, insufficient evidence was presented to show the amount of damages which relate only to the problems in the valley caused by the errors attributable to Perez and Elliot. Thus, Standard must bear the burden of the damages incurred due to the leaking roof.
However, the roof was not rejected and replaced solely on the basis of the leaks. It was also rejected because of its wrinkled appearance. We cannot ignore the fact that regardless of whether the leaks existed or could have been repaired, the roof had to be replaced due to the wrinkles.
The preponderance of the evidence supports a finding that the cause of the wrinkles in the Chem-Ply was the use of the continuous base sheet over the tectum boards. The wrinkles appeared even when the base sheet and Chem-Ply were applied with the undisputed superior workmanship *880 of Sechrist-Hall. The testimony of Mr. Donnel indicates that wrinkles on the second roof were a little smaller, but sufficient to require rejection of the roof had the work continued. In his opinion, the wrinkles were inevitable based on the use of the continuous base sheet. We are convinced that Standard's poor workmanship in the application of the base sheet and Chem-Ply did not contribute in any significant manner to the wrinkled appearance. While Standard may be liable technically or constructively to Elliot as the supplier of the Chem-Ply, it is not primarily at fault for the continuous base sheet design requirement.
The next issue involves determining the party or parties responsible for the wrinkles. The change in the design specifications adopting the continuous base sheet is evidenced by an interoffice memorandum by C.J. Klasen of Celotex's parent company, which describes the basis for that decision as follows:
Bill LeGrow, Gerry Stanley [other Celotex representatives] and I all agreed that a base sheet should be required over the Tectum although one had not been specified. The base sheet should be applied with SIS Adhesive. The base sheet is required:
A. To cover and protect the Tectum from the weather. National Gypsum requires that all Tectum be covered within 24 hours of installation and there is no way that the CHEM-PLY can be applied to conform to this requirement.
B. The base sheet will tend to minimize some of the irregularities in the Tectum deck that are anticipated.
C. Celotex now requires a base sheet over all precast decks.
This recommendation was made after it was learned that Elliot had improperly stored some of the tectum and the factory-applied felt was wrinkling.
Elliot accepted the recommendation from Celotex and adjusted its contract with Standard to pay for the additional work. Ron Pilgrim of Perez testified that Perez also agreed to abide by the recommendation of Celotex, although it had no idea that the base sheet would cause a new problem. However, Perez never issued a change order implementing the change into the original specifications. Perez, Standard, and Elliot all felt that Celotex's recommendation had to be followed in order to obtain a bonded roof from Celotex.
If the State was bringing an action against Perez to recover for its cost to replace the roof, we have no doubt that Perez would be cast as a party responsible for the wrinkles under the provisions of its contract. That action would be based on Perez's contractual obligations to oversee and supervise the project. However, in this suit, we consider only Standard's right to indemnification or contribution from Perez pursuant to its third party demand. Perez contracted with the State only and has no contractual obligation to Elliot or Elliot's subcontractor, Standard.
However, Perez, as the project architect, may be subject to an action in tort brought by Standard even in the absence of any privity of contract.[7] Such an action arises when there is a breach of a duty owed independently of the contract between the owner and architect. See Gurtler, Hebert & Co. v. Weyland Mach. Shop, 405 So.2d 660 (La.App. 4th Cir.1981), writ denied, 410 So.2d 1130 (La.1982); Calandro Development, Inc. v. R.M. Butler Contr., Inc., 249 So.2d 254 (La.App. 1st Cir.1971). An architect is deemed to know that his services are for the protection of the owner's interest, as well as the protection of other third parties who have no supervisory power whatsoever and must rely on the architect's expertise in providing adequate supervision, plans, and specifications. See Calandro Development, Inc. v. R.M. Butler Contr., Inc., supra.
However, we find that the evidence is insufficient to show that Perez breached *881 any duty owed to Standard or Elliot. Perez never issued a written change order adopting the continuous base sheet design as part of its plans and specifications. It admittedly relied on the procedure established by Celotex and approved by Elliot which made that design change. However, it cannot be faulted for relying on the recommendations of the manufacturer, particularly when it had not been adequately warned about the wrinkling potential of the recommended procedure and when manufacturer approval was required to obtain a bonded roof.
We hold that Perez did not breach any duty owed to Standard or Elliott by allowing the application of the continuous base sheet.
The argument is made that the use of the continuous base sheet was caused by Elliot's improper storage of the tectum at the job site. However, only 25% of the total tectum was improperly stored, and there was additional testimony that only the tectum boards near the top of the stacks actually had wrinkled felts. Celotex required that the continuous base sheet be applied over the entire roof, whether or not the factory-applied felts on the tectum had to be removed. Celotex required the continuous base sheet on the re-roofing job in areas where there was no problem with factory-applied felts. While Elliot's negligent storage of the tectum may have been a cause-in-fact of the application of the continuous base sheet, it was certainly not the legal cause. Additionally, Elliot has been dismissed from this proceeding due to settlement and is not a party to this appeal.
The responsibility for the wrinkled roof and the resulting costs incurred by Elliot must be with Celotex, the manufacturer and the party which initiated and required the continuous base sheet design. While the Chem-Ply itself may not have been inherently defective, the application specifications required by Celotex were defective.
Celotex advertised Chem-Ply as a product designed to conform to "exotic-type roofs" which are those that are necessarily visible and become part of a building's architecture. Thus, the aesthetic appeal of such a roof is of obvious importance and the rejection of any such roof due to its unappealing appearance is entirely proper. This is particularly so in this case where Celotex's sales brochures emphasized the dependability and aesthetic appeal of Chem-Ply.
Once Chem-Ply was selected for the minidome, Celotex representatives worked with Perez in obtaining overall specifications for the deck assembly and the roofing system. When the problem arose with the wet tectum, Celotex required the use of the continuous base sheet, which would allegedly "minimize the irregularities" of the tectum deck. This requirement was made at a time when Celotex, as manufacturer, presumably knew of the wrinkling tendency around the tectum joints. Celotex was the party ultimately responsible for the continuous base sheet requirement, which resulted in the wrinkled appearance. While the Chem-Ply was not necessarily defective per se, the application specifications required by Celotex were defective.
Although evidence was presented to show that there had been delamination and resiliency problems encountered with the product in general due to inadequate heating during manufacture, that defect was not the primary cause of the wrinkles or the roof's replacement. The cause was the continuous base sheet requirement imposed by Celotex. While Celotex offered an alternative to Elliotpurchasing new tectumCelotex should not be exonerated because the wrong choice was made.
We must now consider the basis of the liability imposed. Each party at faultStandard and Celotexhad separate obligations to perform separate acts. Standard was contractually bound to Elliot to perform its subcontract in a workmanlike manner; Celotex was bound to provide a roofing system that was appropriate for the project and to provide proper installation instructions for its product. Each party promised or was obligated separately to perform distinct acts. The obligations were several in that regard. LSA-C.C. art.
*882 2078[8] (prior to Acts 1984, No. 331, § 1, now LSA-C.C. art. 1787). There was no solidary obligation for the performance of the separate obligations. Town of Winnsboro v. Barnard & Burk, Inc., 294 So.2d 867 (La.App. 2nd Cir.1974), writs refused, 295 So.2d 445 (1974).
It does not follow, however, that the obligations now owed by Standard and Celotex remain several. The obligation at issue in this suit and the one enforced by Elliot at trial is the payment of damages by the parties responsible for the defective roof due to the breach of their respective contracts and duties. See Town of Winnsboro v. Barnard & Burk, Inc., supra.
Unlike the trial court, we find that the roof had to be replaced because of two problemsit was not watertight, and it was wrinkled in appearance. Each problem was of such severity, that in the absence of the other problem, replacement was necessary. The waterproofing problems were caused primarily by Standard's substandard workmanship. The wrinkled appearance was the result of Celotex's continuous base sheet requirement. Each problem was sufficient to require a new roof. Both parties' actions combined and contributed to cause the same item of damages, an unacceptable roof, and both parties are now obligated to pay for the cost of repair.
Standard has been compelled to pay the whole amount of damages and payment by Standard exonerates Celotex. However, Standard is entitled to contribution by virtue of its payment of the total obligation. The parties are obligated differently by reason of the various duties and contractual relationships, but they are both bound for the cost of replacing the roof. It matters not that the respective parties' obligations to repair the loss arise separately from an offense or quasi-offense or from a contract, or both. Reeves v. Dixie Brick, Inc., 403 So.2d 792 (La.App. 2nd Cir.1981); Town of Winnsboro v. Barnard & Burk, Inc., supra. All of the elements of an obligation in solido are met.
Standard also requests indemnification in redhibition for its attorney's fees and costs by Celotex under LSA-C.C. art. 2545. However, in order for a party to make a claim for indemnification that party must itself be free of fault and liable only vicariously or derivatively. See Robert v. Bayou Bernard Marine, Inc., 514 So.2d 540 (La.App. 3rd Cir.1987), writs denied, 515 So.2d 1107, 1108 (La.1987); Landry v. Pierre Part Natural Gas Co., Inc., 413 So.2d 621 (La.App. 1st Cir.1982); Dupree v. Pechinay Saint Gobain Co., 369 So.2d 1075 (La.App. 1st Cir.1979), writ denied, 371 So.2d 1341 (La.1979). In this case, Standard itself was at fault in providing substandard workmanship. Hence, it is only entitled to contribution from its solidary obligor, not indemnification.
Standard's request for the amount due under its contract with Elliott is also denied because its work was so defective as to be practically useless. Fortier v. Sessum, 441 So.2d 1238 (La.App. 5th Cir.1983).

DAMAGES
The trial court found that the following damages were incurred by Elliot:

(1) Remove roofing and
 repair deck $ 25,453.00
(2) Replace roof (sub-contractor's
 charge) 138,589.00
(3) Roofing consultant 17,581.00
(4) Painting tectum deck 19,247.00
(5) Time related costs 108,174.00
 ____________
 Total $309,044.00

Only one of these items, painting the tectum deck, can be attributed solely to the leaking roof. The testimony indicates that the tectum had to be repainted due to water stains. All of the other costs were *883 caused by both problemsthe leaking roof and the wrinkled roof.
Appellees argue that the "time related costs" arose due to the delays in interior work caused solely by the leaking roof. However, as the trial court found, delays in interior work were also attributable to the open compression ring, the delayed installation of the window walls and the lack of air conditioning. The importance of these factors is evidenced by the fact that more than ninety percent of the carpentry work, doors, windows and glass work, finishing work, equipment installation and furnishings were completed by September 21, 1975, within the three month period after the air conditioning was turned on.
The trial court concluded that a reasonable delay period attributable to the replacement of the roof was 132 days or the period from September 21, 1975 through January 31, 1976. The evidence shows that Sechrist-Hall spent its first two or three days (September 23-25) on the job repairing the gutter to make it watertight. From that point on, the trial court found that the interior work could proceed without interruption. The delay period of 132 days, which the trial court used to calculate "time related costs," was not attributable to the leaking roof. Both parties are solidarily bound for this amount.
Standard has paid the full amount of the liability owed to Elliot. It is now entitled to collect a virile portion or one-half of the damages from Celotex for which there is solidary liability. LSA-C.C. art. 2104 (prior to Acts 1984, No. 331, § 1, now LSA-C.C. art. 1804).
We find that Standard and Celotex are solidarily bound for all costs except the $19,247.00 cost to paint the tectum deck. Standard is solely responsible for that item.

CONCLUSION
Accordingly, the trial court's judgment finding Standard liable is affirmed. Judgment is rendered in favor of Standard and against Celotex finding that Standard and Celotex are solidarily liable for $289,797.00, and that Standard is entitled to contribution of fifty percent of the total amount, with judicial interest thereon from the date of payment of the solidary obligation to Elliot by Standard. See Ragland v. Viator, 426 So.2d 231 (La.App. 1st Cir.1983). The trial court's judgment dismissing all other parties is affirmed. Costs are assessed to Standard and Celotex.
AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.
*884 
NOTES
[1] All claims against National Gypsum were dismissed during the trial.
[2] Elliot and USF & G also filed appeals.
[3] The new base sheet was a significant change in that it would be continuous from one plank of tectum to the next, bridging the joints between the tectum boards. The testimony revealed that in 1971, Celotex began requiring the use of a continuous base sheet on all of its jobs. However, it did not relate this change to anyone involved with the minidome project until it was discovered that the tectum felts were unusable.
[4] Celotex later responded that it had no responsibility for the job because the primary complaint was with Chem-Ply's appearance and that it had warned the parties that the use of the continuous base sheet would not completely eliminate "telegraphing or buckling of felt skins and ridging at the Tectum joints."
[5] The wrinkles on the re-roofing project appeared the day after the building's air conditioner was turned off. The wrinkling reportedly stabilized once the air conditioner was reinstated. The air conditioning was not in use during the initial roofing job.
[6] The court also granted Standard's third party demand against USF & G for $145,002.00, the amount allowed under the comprehensive general liability policy provided Standard and for $30,449.61 in legal defense costs owed under the policy. Due to the settlement, USF & G's liability is not at issue on appeal.
[7] There is no evidence in the record on appeal which indicates that Elliot filed a third party demand against Perez.
[8] LSA-C.C. art. 2078 (prior to Acts 1984, No. 331, § 1) states:

Several obligations are produced, when what is promised by one of the obligors, is not promised by the other, but each one promises separately for himself to do a distinct act; such obligations, although they may be contained in the same contract, are considered as much individual and distinct as if they had been in different contracts, and made at different times.