PETTIGREW, J.
|2In this contract dispute arising out of a public works construction project, the property owner and the construction contractor settled their claims against each other while reserving their rights against the engineering firm. From a judgment granting the engineering firm’s motion for summary judgment, the contractor has appealed. We reverse and remand.
FACTS
This matter arises out of a contract dispute between the Greater Lafourche Port Commission (“the Port”) and James Construction Group, LLC (“James”) for the construction of a steel sheet piling bulkhead and mooring bits (“the Project”) located at Port Fourchon, Lafourche Parish, Louisiana.1 Prior to entering into a contract with James, the Port, retained Piccio-la & Associates, Inc. (“Picciola”) to provide professional engineering services related to the Project.
On or about May 1, 2004, the Port entered into a written agreement with Picci-ola pursuant to which Picciola agreed to provide “necessary professional services” that included “design phase” as well as “bidding & construction phase” services. Picciola’s design phase services included the preparation of plans and technical specifications that would govern the contractor’s work on the Project. With respect to construction phase services, Pic-ciola agreed to assist the Port in securing and analyzing bids, and awarding the construction contracts. Picciola also agreed to prepare the formal documents for the award of the construction contracts, provide the Port with weekly progress reports, issue instructions from the Port to the contractor, and serve as the Port’s representative with authority to act on the Port’s behalf. The agreement further provided that Picciola would make routine visits to the site, act as interpreter of the terms and conditions of the contract documents, evaluate the contractor’s performance thereunder, and approve and recommend to the Port payments to the contractor.
|sOn December 9, 2004, Picciola issued Addendum No. 1 of the Contract, which provided that the contractor would be assessed stipulated damages of $2,000.00 per day for failure to complete a specific portion of the Project known as the “Delmar Site,” within 210 days of the issuance of the Notice to Proceed.
After public bidding, the Port and James entered into the Contract on January 26, *862005, for the construction of the Project in the amount of $8,405,240.00. The work to be performed was composed of a “Base Bid,” “Alternate A,” and “Alternate B.” The “Base Bid” generally covered construction of roughly 3,000 linear feet of steel sheet piling and mooring bits and associated excavation and filing work. “Alternate A” covered construction of two (2) 30' x 70' Crane Pads. “Alternate B” covered construction of one (1) 67' Diameter Crane Pad Foundation. Both the General Provisions and Special Provisions of the Contract clearly defined the Contract Time, or the number of calendar days allowed for completion of the Project, at 300 days.
That portion of the Project known as the “Delmar Site” was composed of three (3) specific items: (1) Approximately 537 linear feet of bulkhead; (2) Alternate “A” (two (2) 30' x 70' Crane Pads); and (3) Alternate “B” (one (1) 67' Diameter Crane Pad Foundation). All three components of the Delmar Site were originally situated adjacent to the Flotation Canal.
On February 15, 2005, a Pre-Construction meeting was held wherein representatives of the Port, Picciola, and James discussed the possibility of a relocation of the Delmar Site. Thereafter plans were revised on March 15, 2005, and reissued on April 4, 2005, which depicted the Delmar Site, including Alternate “A” and Alternate “B” being moved or relocated from the Flotation Canal to Slip B. To accomplish this change, James requested an additional $144,459.77 in compensation and nine (9) additional contract days. On April 27, 2005, the Port granted James’ request and executed “Plan Change No. 1.”
The Notice to Proceed defined the commencement of the Contract Time as April 25, 2005. Plan Change No. 1 relocated the Delmar Site in exchange for the additional $144,459.77 with nine (9) additional days added to the 300-day Contract Time. Plan |4Change No. 1 also extended the Contract completion date from February 18, 2006 to February 27, 2006. On January 5, 2006, the Contract Time was extended an additional thirty-six (36) calendar days pursuant to “Plan Change No. 2,” which compensated James for delays resulting from Hurricanes Katrina and Rita. As a result of these extensions, the Contract Time was extended an additional forty-five (45) days. Consequently, the Revised Contract Completion Date was extended to April 4, 2006 (345 days from the Notice to Proceed) and the interim deadline for completion of the Delmar Site was extended to January 5, 2006 (245 days from the Notice to Proceed). The Delmar Site was completed on May 17, 2006, 133 days past the interim deadline of January 5, 2006. Accordingly, the Port withheld $266,000.00 (133 days @ $2,000.00 per day) from the payment to James as stipulated damages resulting from the failure of James to complete the Delmar Site in a timely manner.
PROCEDURAL HISTORY
As mandated by La. R.S. 38:2243, the Port filed the instant concursus proceeding in Lafourche Parish on November 21, 2006, to disburse the funds retained. In response, James filed an Answer, Recon-ventional Demand and Third Party Demand on March 7, 2007, wherein James asserted claims and demands against both the Port and Picciola. Specifically, James claimed that the Port breached its contract with James by improperly withholding and retaining liquidated damages, retainage, and the contract balance of $756,909.00. James further claimed that it detrimentally relied on certain representations by Pic-ciola to the effect that it would not be required to complete the Delmar Site within 210 days and that the associated *87provision of Addendum No. 1 relating to stipulated damages would be waived. Accordingly, James asserted claims for improperly withheld stipulated damages and additional costs it allegedly incurred due to its re-sequencing of the work based upon Picciola’s representations that stipulated damages related to the Delmar Site would be waived. James took the position that because the Port and Picciola had allegedly caused and/or contributed to the project delays, the Port was not entitled to liquidated damages.
|fiThe Port and James later settled their disputes and submitted a Joint Motion for Partial Dismissal of all claims against each other with each party expressly reserving all remaining rights, claims, and defenses against the remaining defendant, Picciola. Thereafter, James filed a First Amended and Supplemental Incidental Demand naming Picciola’s insurer, Lloyds of London (“Lloyds”), as a third party defendant in this matter.
On March 28, 2011, Picciola filed a Motion for Summary Judgment seeking a dismissal of all of James’ claims against Picci-ola. With respect to James’ claims that it was entitled to recover from Picciola the full amount of any judgment for liquidated damages, Picciola contended that James’ release of its claims against the Port as principal also released any claims against Picciola as the Port’s disclosed agent. As to James’ claims that Picciola negligently issued ambiguous or defective plans and contract documents thereby misleading James and causing delays, disruptions, and increased costs, Picciola further contended that James had no evidence to establish these claims.
James filed a memorandum in opposition to Picciola’s Motion for Summary Judgment, and on May 6, 2011, a hearing was held in the district court. On June 27, 2011, the trial court rendered its judgment granting Picciola’s motion and dismissing the claims put forth by James. In its Reasons for Judgment, the trial court noted that Picciola,
acted as a professional engineer on the part of the property owner and as such was in charge of construction management for the owner. There has been no showing under the requirement of La. [Code Civ. P.] art. 966 that [James] can bear his burden of proof at a trial and as such this Court grants [Picciola’s] Motion for Summary Judgment finding there are no genuine issues of material fact.
On July 6, 2011, James filed a timely Motion for Devolutive Appeal.
ISSUES PRESENTED FOR REVIEW
In connection with its appeal in this matter, James sets forth the following issues for review and disposition by this court:
1. Does an engineer owe duties to a construction contractor, such that the engineer may be liable in damages for negligence, providing deficient design specifications, causing delays or disruptions, or for misrepresentation related to his performance.?
2. Was summary judgment of dismissal appropriate in the context of the contractor’s unrefuted evidence supporting its ex delicto claims against the engineer?
|fi3. Was summary judgment of dismissal appropriate when, at minimum, the record contains evidence demonstrating the existence of genuine issues of material fact?
4. Does La. R.S. 9:2771 shield a contractor from liability arising from defects caused by plans or specifications that are furnished to him?
*885. May an engineer incur liability to a contractor based on the latter’s detrimental reliance on the former’s representations related to the work?
SUMMARY JUDGMENT
A motion for summary judgment is a procedural device used to avoid a full scale trial when there is no genuine issue of material fact. Gonzales v. Kissner, 2008-2154, p. 4 (La.App. 1 Cir. 9/11/09), 24 So.3d 214, 217. Summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact, and that mover is entitled to judgment as a matter of law. La.Code Civ. P. art. 966(B). Summary judgment is favored and is designed to secure the just, speedy, and inexpensive determination of every action. La. Code Civ. P. art. 966(A)(2); Aucoin v. Rochel, 2008-1180, p. 5 (La.App. 1 Cir. 12/23/08), 5 So.3d 197, 200, writ denied, 2009-0122 (La.3/27/09), 5 So.3d 143.
On a motion for summary judgment, the burden of proof is on the mover. If, however, the mover will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the mover’s burden on the motion does not require that all essential elements of the adverse party’s claim, action, or defense be negated. Instead, the mover must point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, the adverse party must produce factual evidence sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. If the adverse party fails to meet this burden, there is no genuine issue of material fact, and the mover is entitled to summary judgment. La.Code Civ. P. art. 966(C)(2); Robles v. ExxonMobile, 2002-0854, p. 4 (La.App. 1 Cir. 3/28/03), 844 So.2d 339, 341.
|7In determining whether summary judgment is appropriate, appellate courts review evidence de novo under the same criteria that govern the trial court’s determination of whether summary judgment is appropriate. Boudreaux v. Vankerkhove, 2007-2555, p. 5 (La.App. 1 Cir. 8/11/08), 993 So.2d 725, 729-730. An appellate court thus asks the same questions as does the trial court in determining whether summary judgment is appropriate: whether the mover is entitled to judgment as a matter of law. Ernest v. Petroleum Service Corp., 2002-2482, p. 3 (La.App. 1 Cir. 11/19/03), 868 So.2d 96, 97, writ denied, 2003-3439 (La.2/20/04), 866 So.2d 830.
 A motion for summary judgment is rarely appropriate for disposition of a case requiring judicial determination of subjective facts such as intent, motive, malice, good faith, or knowledge. Bilbo for Basnaw v. Shelter Insurance Company, 96-1476, p. 5 (La.App. 1 Cir. 7/30/97), 698 So.2d 691, 694, writ denied, 97-2198 (La.11/21/97), 703 So.2d 1312. Further, issues that require the determination of reasonableness of acts and conduct of parties under all facts and circumstances of the case cannot ordinarily be disposed of by summary judgment. Granda v. State Farm Mutual Insurance Company, 04-1722, pp. 4-5 (La.App. 1 Cir. 2/10/06), 935 So.2d 703, 707, writ denied, 06-0589 (La.5/5/06), 927 So.2d 326.
In its brief to this court, James cites Stroder v. Horowitz, 34,048, p. 4 (La.App. 2 Cir. 12/20/00), 775 So.2d 1175, 1178; McGill v. Cochran Sysco Foods, Div. of Sysco Corp., 29,154, p. 2 (La.App. 2 Cir. 2/26/97), 690 So.2d 952, 953; and DeStevens v. Harsco Corp., 94-1183, p. 3 (La.App. 4 Cir. 3/16/95), 652 So.2d 1054, 1057, for the proposition that questions of negli*89gence are generally inappropriate for disposition by summary judgment.
ANALYSIS
The numerous issues raised by James in connection with its appeal in this matter relate to whether the trial court’s grant of Pieciola’s motion for summary judgment was appropriate. James asserts that contrary to Picciola’s arguments and the findings of the trial court, its claims against Picciola are not based on the Contract, but rather from breaches of independent duties that Picciola allegedly owed to James. James claims | sthat said breaches include negligence, supply of defective plans and specifications, misrepresentations, as well as delays and disruptions that resulted in damages.
Picciola argues in response that James was aware that under the terms of the Contract, Picciola was the Port’s direct representative, and as such, was responsible for the administration of the Contract. Picciola further argues that the Contract between the Port and James “clearly gave Picciola the authority to give directions pertaining to the work, and to alter or waive contract provisions.” Picciola contends that the claims put forth by James relate to representations made by Picciola within the scope of its authority, and as such, James should have asserted said claims against the Port rather than Piccio-la. Given James’ previous settlement of its claims against the Port, Picciola argues James cannot now assert those same claims against it as Picciola served as the Port’s agent. Picciola further, argues that as James failed to establish that Picciola breached its professional duty of care, no liability can be imposed.
Our jurisprudence uniformly holds that the duty owed by those practicing learned professions to their clients, patients or retainers, is that of exercising that degree of professional care and skill customarily employed by others of the same profession in the same general area. This test has been specifically applied to engineers in Pittman Construction Co. v. City of New Orleans, 178 So.2d 812, 317-18 (La.App. 4 Cir.), writ denied, 248 La. 434, 179 So.2d 274 (La.1965); Calandro Development, Inc. v. R.M. Butler Contractors, Inc., 249 So.2d 254, 265 (La.App. 1 Cir.1971); see also, A.F. Blair Co., Inc. v. Mason, 406 So.2d 6 (La.App. 1 Cir.1981). In instances of this nature, the burden is upon plaintiff to establish the degree of care and skill required by local standards of the professional involved. Calandro, 249 So.2d at 265. Plaintiff must likewise prove the failure of the professional to exercise the degree of care required. Calandro, 249 So.2d at 265.
In Gurtler, Hebert, and Co., Inc. v. Weyland Machine Shop, Inc., 405 So.2d 660, 662 (La.App. 4 Cir.1981), writ denied, 410 So.2d 1130 (La.1982), a design professional (i.e., architect), like Picciola in the instant case, sought summary dismissal of a subcontractor’s claims on the grounds that (a) the architect was merely “the agent |9of the project owner,” and (b) the architect owed no duty to a subcontractor as there existed no privity of contract between them. The allegations put forth by the subcontractor in Gurtler are startlingly similar to those put forth by James in the present case. In Gurtler, the subcontractor alleged that the architect failed to provide adequate plans and specifications, to act reasonably in approving or rejecting the shop or detailed drawings submitted by the subcontractor, and to notify other subcontractors and suppliers “of decisions solely within its discretion,” which led to delays and cost overruns.
Upon review, the Fourth Circuit in Gurtler reversed the trial court and set aside an exception raising the objection of *90no cause of action and/or no right of action on the grounds that the plaintiff sub-contractor had a cause of action against the architect for damages in tort even though there was no privity of contract between the subcontractor and the architect. The Fourth Circuit in Gurtler explained:
Where the damage sued for is the defectively performed work itself, the action is strictly a contractual one and only those who are in privity with the contractor have an action against him. However, where the damage sued for is not the defective work but is instead damage caused by the defective work, a tort action against the contractor is proper when the elements for delictual recovery are present.
Gurtler, 405 So.2d at 662 (quoting Lumber Products, Inc. v. Hiriart, 255 So.2d 783 (La.App. 4 Cir.1972)).
The court in Gurtler ultimately found:
From our consideration of the foregoing cases, we conclude that absent privity of contract a cause of action cannot be asserted based on breach of contract; however, this does not preclude asserting a claim for damages based on the wrongdoer’s tort.
Gurtler, 405 So.2d at 662.
More recently, this court, in its opinion in M.J. Womack, Inc. v. House of Representatives of State, 509 So.2d 62 (La.App. 1 Cir.), writs denied, 513 So.2d 1208, 1211 (La.1987), examined the case of a contractor which brought an action against the Louisiana House of Representatives and its architectural firm to recover the early incentive payment the contractor would have received had a renovation project at the state capítol been completed on time. This court reversed the trial court and found | inthat the architect’s actions fell below the acceptable standard, and further, that expert testimony is not always required where lay persons can infer that a professional was negligent through application of a common sense standard. M.J. Womack, Inc., 509 So.2d at 66-67. The court further found that the Louisiana House was not liable for the actions of its architect as the architect is the agent of an owner when the architect acts as the owner’s supervisor on a project; however, an architect, as far as the preparation of plans is concerned, acts as an independent contractor. M J. Womack, Inc., 509 So.2d at 67 (quoting 5 Am.Jur.2d, Architects, § 6 (1962)).
In Standard Roofing Co. of New Orleans v. Elliot Construction Company, Inc., 535 So.2d 870 (La.App. 1 Cir.1988), writs denied, 537 So.2d 1166, 1167 (La.1989), this court recognized that a design professional (i.e., architect),
may be subject to an action in tort brought by [a subcontractor] even in the absence of any privity of contract. Such an action arises when there is a breach of a duty owed independently of the contract between the owner and architect. An architect is deemed to know that his services are for the protection of the owner’s interest, as well as the protection of other third parties who have no supervisory power whatsoever and must rely on the architect’s expertise in providing adequate supervision, plans, and specifications.
Standard, 535 So.2d at 880 (citations omitted).
Later, in Young v. City of Plaquemine, 01-0063 (La.App. 1 Cir. 5/10/02), 818 So.2d 892, this court reviewed a case in which painters, who became ill from exposure to lead while working on a restoration project, brought a negligence action against the city that owned the building, the general contractor, and the architect. The court opined, “[therefore, an architect’s duty to a subcontractor who is not privy to *91the contract is similar to that owed by other professionals such as attorneys and physicians, i.e., one of professional care and skill customarily employed by other architects in the same general area.” Young at 01-0063, p. 8, 818 So.2d at 897. The court reversed the trial court’s grant of summary judgment in favor of the architect and determined that the architect had an independent professional duty to exercise an appropriate level of care to determine the existence of hazardous materials including lead and asbestos.
[nBased upon the foregoing jurisprudence, we conclude that absent a privity of contract, James may not assert a cause of action against Piceiola based upon a breach of the Contract; however, this will not preclude James from asserting a cause of action in tort based upon Piccio-la’s alleged negligence.
Accordingly, we now examine the allegations put forth by James in connection with its Answer, Reconventional Demand and Third Party Demand to determine whether James asserts a cause of action for damages in tort against Piceiola. In connection with its third party demand against Piceiola, James alleged, in pertinent part:
12.
In reliance on the Project plans and contract documents prepared by [Piccio-la] and furnished on behalf of [the Port], James developed a planned sequence for the work, and an estimate of the costs based thereon. James prepared and submitted a bid to perform the work in accordance with the said plans and contract documents.
[[Image here]]
15.
Addendum No. 1 to the Contract stated, inter alia, The Contractor shall be assessed Stipulated Damages of $2000 per day for failure to complete the Delmar Site Section of the Project, approximately 537 linear feet .from the bulkhead .from Station 100 + 00 to 105 + 37 ... within 210 days from the Contract Notice to Proceed.
16.
Sheet No. 3 of the (original) Project plans showed the location of a portion of the work designated as “Delmar Site” at the northern side of the Project, between stations 100 + 00 and 105 + 37. With an arrow pointing to that location, Plan Sheet no. 3 contained the notation: ‘Delmar Site due 210 calendar days after Contract award.”
17.
Consistent with the Contract documents (including plan sheets) James planned to start work at station 100 and complete the “Delmar Site” within 210 days. James prepared and submitted a project schedule to [Piceiola] which showed the completion of the “Delmar Site” within 210 days.
18.
In or about April of 2005, [Piceiola] advised James that the location of the “Delmar Site” was to be moved to the eastern side of the Project, between stations 115 and 120, and that James’ work was to start at station 130 — which was approximately 3000 feet from the intended starting point. Because there was no access road at station 130, this directive caused a substantial change to James’ planned sequence of the work and adversely affected the efficiency of James’ work.
*9219.
On [the Port’s] behalf, [Picciola] issued and provided to James a revised “Sheet No. 3” which moved the location of the “Delmar Site” from its original location (between stations 100 + 00 and 105 + 37) to the eastern side of the Project (stations 115 and 120). The revised Sheet No. 3 also deleted the requirement that the Delmar site be completed within 210 days after Contract award.
20.
|12Puring a meeting in or about April 2005, [Picciola] stated that James would not be required to complete the work on the Delmar Site within 210 days. James thereafter prepared and submitted a revised project schedule to [the Port’s] engineer, which showed the completion of the “Delmar Site” after 210 days and towards the end of the Project. [Piccio-la] approved that revised schedule.
21.
In reliance upon [Picciola’s] representations, as well as its issuance of the revised plan sheet and approval of James’ revised schedule, James changed its plan of performance of the work. Because James could not build the Delmar Site at Station 100 + 00 to 105 + 37, [Picciola] led James to believe, and James understood that the term “Stipulated Damages of $2000 per day for failure to complete the Delmar Site Section of the Project, approximately 537 linear feet from the bulkhead from Station 100 + 00 to 105 + 37 ... within 210 days from the Contract Notice to Proceed ” had been totally eliminated.
22.
During the course of the work, [the Port] and [Picciola] initiated other changes to the Project work and the Contract including, but not limited to, those annexed to [the Port’s] petition as “Exhibit C”, “Exhibit D” and “Exhibit E.” [The Port] and [Picciola] disrupted and interfered with James’ plan to efficiently perform and/or complete the work within the original contract duration.
23.
James incurred additional costs, expenses and damages (in the form of increased direct costs and indirect costs) as a result of the disruptions, interferences and delays caused by [the Port] and [Picciola].
[[Image here]]
27.
James relied to its (apparent) detriment on representations by [Picciola] that (a) James was not required to complete the Delmar site within 210 days, and (b) that the $2000 per day amount would not be assessed for delays to the Delmar site. Therefore, if James is liable for any delays or liquidated damages (which is denied), James is entitled to recover the full amount thereof from [Picciola].
[[Image here]]
[Picciola] was negligent and breached its duties to James by (inter alia) issuing ambiguous or defective plans and contract documents, misleading James and/or misrepresenting the Owner’s intentions and with regard to the Delmar site and associated stipulated damages, and otherwise *93causing delays, disruptions, interferences and increased costs to the work. [Italics and underscoring in original; bold emphasis supplied.]
In furtherance of the foregoing allegations, at the hearing on Picciola’s motion for summary judgment, counsel for James directed the trial court’s attention to the deposition testimony provided by Joseph C. Picciola, II. Beginning on page 68 of Mr. Picciola’s deposition, which was introduced into evidence as “Exhibit-4,” counsel for James questioned Mr. Picciola regarding the blasting and coatings of certain metal [isbulkheads and sheet pilings that were incorporated into the Project. The specifications prepared by Mr. Picciola mandated that the blasting and coatings be performed, inspected, and approved at offsite shops located in Alabama and New Orleans. When these components were ultimately incorporated into the Project by James, it was found that the paint specified by Mr. Picciola had prematurely degraded or deteriorated resulting in rust.
Mr. Picciola admitted in his deposition testimony that he never undertook an analysis to determine the cause or extent of the premature failure of the coating he specified. Mr. Picciola also admitted that the sheet pilings and other components were blasted and painted in accordance with the methodology specified by him in the contract documents, and further that James complied with his specifications regarding blasting and coating. Nevertheless, the Port ultimately refused to accept the Project until the pilings and other components were recoated at James’ expense.
We further note that both sides presented evidence regarding the relocation of the Delmar Site. Based upon the evidence presented at the hearing on Picci-ola’s motion for summary judgment, serious factual disputes remain with respect to whether Picciola was independently negligent in its representations to James as to whether or not the Port would agree to waive the stipulated damages provision. At the hearing, counsel for James argued that the evidence put forth by Picciola failed to exculpate Picciola from negligence, and further, Picciola failed to establish an absence of support for the claims put forth by James.
Accordingly, we conclude that there remain genuine issues of material fact that preclude the granting of summary judgment.
DECREE
For the foregoing reasons, the trial court’s grant of summary judgment in favor of Picciola & Associates, Inc. and against James Construction Group, LLC. is reversed and set aside. This matter is hereby remanded to the trial court for further proceedings | ^consistent with this opinion. All costs associated with this appeal are assessed against Picciola & Associates, Inc.
REVERSED AND REMANDED.
McClendon, j. concurs.

. The contract at issue was State Project No. 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 entitled, "Northern Expansion Phase 1 Part C, Bulkhead Contract 1 (Contract 1 of SPN 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) Steel Sheet Piling Bulkhead and Mooring Bits” (the "Contract”).