MAX N. TOBIAS, JR., Judge.
| fin this concursus proceeding, the appellant, LTA, Inc. (“LTA”), appeals the trial court’s granting of summary judgment in favor of the appellees/defendants, Chevron USA, Inc. and Huntington Beach Company (collectively, “Chevron”), entitling Chevron to the monies deposited into the registry of the trial court. For the *950 reasons that follow, we find that genuine issues of material fact remain precluding summary judgment. Accordingly, we reverse the trial court’s judgment and remand this matter for further proceedings.
FACTUAL BACKGROUND AND PROCEDURAL HISTORY
Stewart Title of Louisiana (“Stewart Title”) initiated the instant concursus proceeding following the breach of a Purchase and Sale Agreement (“PSA”) executed on 14 June 2010 between Keiichi-Mar Investing, LLC (“Keiichi-Mar”) and Chevron. Pursuant to the PSA, Keiichi-Mar agreed to purchase from Chevron the former Chevron building, located at the corner of O’Keefe Avenue and Gravier Street in New Orleans.[1] The appellant, LTA, was not a signatory to the PSA.[2] |2The PSA required an initial $300,000.00 deposit by Keiichi-Mar as purchaser upon its acceptance, which became non-refundable after the 15-day inspection period.[3] In the event of Keiichi-Mar’s default, the PSA provided for Chevron as seller to retain the deposit as liquidated damages.
Keiichi-Mar signed the PSA on 9 June 2010. The following day, LTA, which undeniably stood to profit from Keiichi-Mar’s successful purchase of the Chevron building by virtue of a supplementary agreement executed by Keiichi-Mar in LTA’s favor, delivered a company check in the amount of $300,000 to Stewart Title’s chief operating officer, Sharall Grissen, with specific verbal instructions that the money not be referenced or earmarked to any particular purchase agreement or escrow document number.[4] Chevron then executed the PSA on 14 June 2010. On 17 June 2010, Chevron threatened to back out of the PSA unless Keiichi-Mar deposited the earnest money required by the contract by noon of the following day.[5] Within twenty-four hours, the $300,000 check | ^previously delivered to Stewart Title by LTA was deposited into Stewart Title’s commercial escrow account on 18 June 2010. As previously instructed by LTA, the deposit was *951 not posted to any specific contract or purchase agreement. Thereafter, Joyce Du-Saules, Stewart Title’s commercial department assistant, emailed Ed Rubenstein, a senior real estate project manager at Chevron, notifying Chevron that $300,000 of “earnest money” had been deposited into Stewart Title’s escrow account, and subsequently confirmed for him that the check deposited was a company check.[6]
During the ensuing days, it appeared that the sale was moving forward.
Then, on 28 June 2010, Kenneth Lobell, on behalf of LTA, requested that Stewart Title return to LTA the funds that LTA had previously deposited with it in escrow. At the direction of Ms. Grissen, Stewart Title issued a refund check to LTA that same day in the amount of $300,000. Mr. Lobell personally procured the refund check and deposited the funds into LTA’s account at Chase Bank.
Following receipt of LTA’s refund request, Ms. Grissen sent an email to Mr. Rubenstein on the afternoon of 28 June 2010 at Chevron advising him of LTA’s request for a refund check. On 1 July 2010, operating under the assumption that LTA intended for its $300,000 deposit to be considered and treated as Keiichi-Mar’s earnest money deposit under the PSA, and since Keiichi-Mar and Chevron both indicated their intentions to move forward with the sale, Chevron demanded that Stewart Title place a stop payment on the $300,000 refund check it issued to LTA. Accordingly, Stewart Title retracted the monies that were previously refunded to LTA on 28 June 2010.
l4Under the terms of the PSA, the inspection period ended at 5:00 p.m. on 29 June 2010. At no time prior to 29 June 2010 did Keiichi-Mar or Chevron notify Stewart Title that the PSA had been can-celled or that the sale was not going through. Thereafter, however, Keiichi-Mar breached its obligation to purchase the Chevron building, which Chevron argued entitled it to the $300,000 initial deposit made by LTA on behalf of Keiichi-Mar as liquidated damages under the express terms of the PSA. Contrarily, LTA argued that the $300,000 deposit was made on its own behalf and for its own benefit and, thus, LTA was free to withdraw the money at any time.
In accordance with the terms of the PSA, because Chevron and LTA asserted competing interests to the $300,000, Stewart Title deposited the money into the registry of the court and initiated the instant concursus proceeding.[7]
Chevron moved for summary judgment on the basis that the testimony and evidence established that no genuine issue of material fact existed as to whether the $300,000 deposited with Stewart Title by LTA was intended by the parties to be considered and treated as Keiichi-Mar’s initial deposit required under the PSA and, as such, when Keiichi-Mar breached the PSA, Chevron was entitled to the deposit as liquidated damages. The trial court determined that “the facts supported the conclusion that LTA intended its check to be used and considered as Keiichi-Mar’s deposit.” Accordingly, on 5 April 2012, the trial court, assigning reasons, granted Chevron’s motion entitling Chevron to the funds deposited into the registry of the court as a result of Keiichi-Mar’s breach of the PSA.
*952 It is from this judgment that LTA filed the instant appeal.
| r,DISCUSSION
Initially, we consider Chevron’s contention that LTA’s appeal raises an issue that is not properly before the court. Specifically, citing Canons from the Code of Judicial Conduct, LTA assigns as error the trial judge’s failure to recuse herself.[8] LTA did not raise the recusal issue in the trial court and, thus, has not properly preserved the issue for appeal. ' Recusal of a judge is governed by La. C.C.P. arts. 151 through 161. La. C.C.P. art. 154 specifically requires that a party desiring to re-cuse a judge of a district court file a written motion, assigning the ground for recusation. The record in the instant case contains no written motion for recusal. Moreover, the trial court made no ruling concerning recusal. With no motion by LTA and no ruling by the trial court, this court has nothing to review. This assignment is without error.
In addition, LTA assigns four reasons why the trial court erred in granting Chevron’s motion for summary judgment entitling Chevron to receive the $800,000 held in the court’s registry. Because we find a genuine issue of material fact precluding summary judgment exists as to whether LTA intended for the $300,000 check it deposited with Stewart Title to constitute Keiichi-Mar’s initial deposit under the PSA, or was intended by LTA to be used solely for its own benefit in the event the sale fell through and LTA desired to move forward with the purchase of the building, we pretermit discussion of the remaining assignments of error and remand this matter for further proceedings consistent with this opinion.
| ^Appellate courts review summary judgments de novo under the same criteria that govern a trial court’s consideration of whether summary judgment is appropriate. John C. Bose Consulting Engineer, LLC v. John T. Campo & Associates, Inc., 07-1001, p. 2 (La.App. 4 Cir. 2/20/08), 978 So.2d 1033, 1034. This procedure is now favored and shall be construed to accomplish those ends. La. C.C.P. art. 966 A(2).
A summary judgment is appropriate only when no genuine issue of material fact exists. La. C.C.P. art. 966 B. If the court finds that a genuine issue of material fact exists, summary judgment must be rejected. Oakley v. Thebault, 96-0937, p. 3 (La.App. 4 Cir. 11/13/96), 684 So.2d 488, 490. Even though summary judgment is now favored, it is not a substitute for a trial on the merits, and it is inappropriate for judicial determination of subjective facts, such as motive, intent, good faith, or knowledge that calls for credibility determinations and the weighing of testimony. S.J. v. Lafayette Parish School Bd., 06-2862, p. 5 (La.6/29/07), 959 So.2d 884, 887. Credibility of a witness is a question of fact. In determining a motion for summary judgment, the court must assume that all affiants are credible. Hutchison v. Knights of Columbus, Council No. 5747, 03-1533, p. 8 (La.2/20/04), 866 So.2d 228, 234. Additionally, summary judgment is rarely appropriate for a determination based on subjective facts such as intent, motive, malice, knowledge or good faith. Penalber v. Blount, 550 So.2d 577, *953 583 (La.1989); Coto v. J. Ray McDermott, S.A., 99-1866, p. 4 (La.App. 4 Cir. 10/25/00), 772 So.2d 828, 880. Facts are “material” if they are determinative of the outcome of the dispute. Penalber, 550 So.2d at 583. If reasonable minds could differ as to an issue of material fact, summary judgment is improper. Woodland Properties, LLC v. New Orleans Sewerage and Water Board, 10-0331, p. 4 (La.App. 4 Cir. 9/29/10), 49 So.3d 443, 445.
With these legal precepts in mind, we now turn to the facts presented by the case sub judice to determine whether the trial court’s grant of summary judgment in favor of Chevron was proper.

Chevron’s Position

Chevron contends that the uncontested facts indisputably establish that LTA intended for its $300,000 check deposited with Stewart Title to serve as Keiichi-Mar’s initial deposit under the PSA. In support of its contention regarding LTA’s intent, Chevron relies upon the affidavit of Ed Rubenstein and the deposition testimony of Sharall Grissen, Joyce DuSaules, and Kenneth Lobell, that set forth the following:
1. The PSA between Keiichi-Mar and Chevron required an earnest money deposit upon execution in the amount of $300,000, which is the exact amount of the LTA check Mr. Lobell delivered to Stewart Title.
2. At the time the LTA check was delivered to Stewart Title, LTA was aware that only one signed and executed purchase agreement involving the sale of the Chevron building existed, and that was the agreement between Keiichi-Mar and Chevron.
3. LTA was not a party to the agreement between Keiichi-Mar and Chevron.
4. By virtue of a “Supplementary agreement and instruction to Stewart Title” executed by Keiichi-Mar on 2 June 2010, LTA was to receive a single payment of $1,000,000 at the closing of the sale of the building to Keiichi-Mar, in exchange for the benefit to Keiichi-Mar of LTA’s prior | «contract negotiations for the building with Chevron and in anticipation of LTA’s expertise in leasing and property management. Payment to LTA was contingent upon Keiichi-Mar’s actual purchase of the Chevron building.
5. Keiichi-Mar executed the PSA on 9 June 2010. On the following day, though LTA was not a party to the PSA and had no obligation to make an earnest money deposit thereunder, Mr. Lobell delivered a $300,000 check written on LTA’s account to Ms. Grissen at Stewart Title, which referenced “Chevron Bldg” in the memo portion of the check.
6. Following receipt of LTA’s check, Ms. Grissen emailed Keiichi-Mar’s owner, broker, and attorney advising them that Stewart Title had received the $300,000 check from LTA “as the earnest money as stated in the contract.”
7. In an email dated 17 June 2010, Chevron threatened to back out of the PSA if an earnest money deposit was not made by the following afternoon. This email was received by Joyce DuSaules, Stewart Title’s Commercial Department Assistance, who testified that she would have forwarded it to both Ms. Gris-sen and Stewart Title’s president, Jim Smith.
8. Less than 24 hours later, on 18 June 2010, at the alleged direction *954 of Mr. Lobell, LTA’s check was deposited by Stewart Title into its escrow account. That same day, Ms. DuSaules sent an email to Mr. Rubenstein at Chevron attaching a copy of the bank deposit slip and referencing the deposit as the “earnest money received.”
|<)9. At no time did Chevron receive notification that Stewart Title’s deposit of LTA’s $300,000 check was intended to be anything other than the “earnest money” required under the executed PSA between Kei-ichi-Mar and Chevron.
10. During his deposition, Mr. Lobell described various conversations he had with Keiichi-Mar regarding LTA’s advancing funds on behalf of Keiichi-Mar, or allowing Keiichi-Mar to use LTA’s deposit as its earnest money deposit.
11. Chevron first learned of LTA’s request for a refund of its check on 28 June 2010 in an email received from Ms. Grissen at Stewart Title, who advised that she did not know the reason behind Mr. Lobell’s request.
12. Neither Chevron nor Keiichi-Mar communicated to Stewart Title that the sale of the building was being cancelled or terminated as both parties at that time intended to proceed with the act of sale.
13. Even after Mr. Lobell’s attempt to withdraw LTA’s deposit, the parties proceeded towards an intended closing on Keiichi-Mar’s purchase of the Chevron building. When Keiichi-Mar ultimately breached the PSA, Chevron notified Keiichi-Mar of its intention to seek the $300,000 deposit as liquidated damages.
Based on the above evidence and deposition testimony, especially as it relates to the timing of both Mr. Lobell’s delivery of LTA’s check to Stewart Title and the date the check was actually deposited into Stewart Title’s escrow account, coupled with the fact that LTA stood to make a $1,000,000 fee from Keiichi-Mar upon the completion of the sale, Chevron concluded — and the trial court agreed — [thatin LTA’s $300,000 deposit was intended by LTA to be considered and treated as Keii-chi-Mar’s earnest money deposit under the PSA.

LTA’s Position

According to LTA, it intended for its deposit to be used solely by LTA in the event Keiichi-Mar defaulted on the PSA so that LTA, assuming it still desired to purchase the building, could move forward with the purchase agreement it had previously negotiated but did not execute with Chevron. In support of its position, LTA relies upon the affidavit and deposition testimony of Sharall Grissen, and the affidavit and deposition testimony of Kenneth Lobell.
In her affidavit, Ms. Grissen states that the $300,000 was delivered by Mr. Lobell to Stewart Title “on behalf of LTA” and that as per Lobell’s specific instructions, Stewart Title had “no executed purchase agreement or other agreement of any kind tying those funds to any purchase contracts.” Her affidavit further provides that the “funds were for LTA’s purposes only.”
Ms. Grissen’s affidavit was corroborated by her deposition. She testified that when Mr. Lobell delivered LTA’s check to Stewart Title, he specifically explained to her that the check was LTA’s money and that he did not want it to be associated with anything other than LTA. Ms. Grissen was questioned regarding the various emails generated by Stewart Title to Keii- *955 chi-Mar and Chevron that referenced LTA’s funds as the “earnest money” required by the PSA. In particular, Ms. Grissen was questioned as to whether Mr. Lobell had instructed her to use those exact terms and, despite Chevron’s suggestion that he did, Ms. Grissen testified that she could not state for certain that this was the case, especially since Mr. Lobell had specifically advised her that the money was solely for LTA’s use. Additionally, Ms. Grissen testified that upon receipt of the LTA check, she took it Indirectly to Ms. DuSaules and explained that Stewart Title was supposed to be receiving an additional agreement with further instructions regarding how Stewart Title was to handle the check. In the interim, in order to ensure for Mr. Lobell that LTA’s check would not be mixed up with Chevron and that it remained clear that the money was LTA’s, Ms. Grissen instructed Ms. DuSaules to place the money in Stewart Title’s escrow account without designating a particular document number or posting the funds to any specific account. Both Ms. Grissen and Ms. DuSaules testified that Stewart Title never did receive any controlling document or agreement advising how LTA’s money was to be handled.
Mr. Lobell conceded that at the time he delivered LTA’s $300,000 check to Ms. Grissen at Stewart Title, he knew only one signed PSA for the sale of the Chevron building existed and that it did not involve LTA or obligate LTA to make any sort of deposit. Mr. Lobell explained that LTA had previously negotiated for months with Chevron for the sale of the building resulting in an identical, albeit unexecuted, PSA with the same terms and conditions (ie., requiring a $300,000 earnest money deposit), and he did not want to lose the building in the event Keiichi-Mar failed to go through with its purchase. Therefore, according to Mr. Lobell, LTA delivered the $300,000 check to Stewart Title with the intent that it be available for LTA’s immediate use to move forward on the unexe-cuted LTA/Chevron PSA in the event the Keiichi-Mar/Chevron PSA fell through and LTA still desired to purchase the building.
Mr. Lobell also conceded that LTA stood to benefit substantially from the Kei-ichi-Mar/Chevron sale, but only in' the event Keiichi-Mar actually purchased the building. Mr. Lobell testified that Keii-chi-Mar indicated to him that they had the funds available to make the requisite earnest money deposit. Nonetheless, in | Tsiorder to facilitate the sale, Mr. Lobell explained that he was amenable to allowing Keiichi-Mar to use LTA’s $300,000 as its own earnest money deposit, but that in order to do so, Keiichi-Mar would have to first execute an assignment giving him control over the contract. According to Mr. Lobell, he specifically instructed Ms. Grissen at Stewart Title not to release LTA’s money to the Keiichi-Mar/Chevron contract until such time and only if Keii-chi-Mar either gave him a contract, executed an assignment of the contract, or LTA executed its own contract for the building.
It is undisputed that Keiichi-Mar never executed any assignment or other document giving Mr. Lobell and/or LTA control over the Keiichi-Mar/Chevron PSA. Consequently, LTA contends it neither intended for Keiichi-Mar to use, nor was Keiichi-Mar at liberty to rely on, LTA’s deposit to fulfill its own obligation to make an earnest money deposit.

The Trial Court’s Judgment

Essential to the trial court’s ruling granting Chevron’s motion for summary judgment is its determination regarding the following as set forth in its reasons for judgment:
*956 There is no dispute that the only PSA signed is between the Chevron defendants and Keiichi-Mar. LTA contends that because it was not a party to the PSA, there was no obligation on behalf of LTA and accordingly, LTA is due a return of its $300,000.00 payment. LTA asserts the $300,000.00 was a deposit to be used solely by LTA in the event LTA desired to purchase the Chevron Building. The Court finds the facts do not support this position.
According to the trial court, having determined that LTA intended for its $300,000 check to be used and considered as Keiichi-Mar’s earnest money deposit, and because neither Chevron nor Keiichi-Mar had communicated to Stewart Title [ isthat the sale of the building had been cancelled or terminated prior to 29 June 2010, the final day of the inspection period, pursuant to the terms of the PSA, the $300,000 deposit became non-refundable on that day. Consequently, the trial court determined that Chevron was entitled to the deposit as a result of Keiichi-Mar’s subsequent breach of the PSA. We disagree.
Based upon our de novo review of the conflicting testimony and evidence contained in the record, we find that reasonable minds could differ as to whether, absent any document or agreement whereby Mr. Lobell and/or LTA was given an assignment or control over the Keiichi-Mar/Chevron PSA, LTA intended for its $300,000 deposit to be considered and treated as Keiichi-Mar’s “earnest money” deposit required by the PSA. “Intent” is generally an issue of fact and required the trial court to make credibility determinations that are not appropriate on summary judgment. The trial judge erred in doing so in this case.
CONCLUSION
For the above and foregoing reasons, the judgment appealed from granting summary judgment in favor of Chevron and Huntington is reversed and this case is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

. Keiichi-Mar and Chevron mutually agreed upon Stewart Title as the escrow and title company to handle the closing of Keiichi-Mar’s purchase of the Chevron building.

. Previously, in May and June 2010, LTA had participated in negotiations with Chevron for the purchase of the Chevron building. A purchase agreement was prepared, but never executed by the parties. Instead, Kenneth Lo-bell, the sole principal of LTA, was put in contact with representatives of Keiichi-Mar, who subsequently negotiated and executed an identical PSA with Chevron for the Chevron building.

. Specifically, the PSA provided:
Purchaser ... shall deposit the sum of Three Hundred Thousand and No/100 Dollars ($300,000.00) in Chase in an interest bearing escrow account ... with a title company mutually agreeable to the Purchaser and Seller.... [T]he Deposit shall become nonrefundable at 5:00 p.m. CDT on the final day of the Inspection Period.

. In addition to the PSA, on 2 June 2010, Keiichi-Mar executed a separate document entitled, "Supplementary agreement and instruction to Stewart Title Company,” which provided, in part, that upon completion of the sale of the Chevron building, Keiichi-Mar would pay an additional $1,000,000 through escrow to LTA for consultative services. This one-time payment was contingent upon Keii-chi-Mar’s ultimate purchase of the building. This consulting fee was being paid to LTA in exchange for the benefits Keiichi-Mar was receiving from LTA’s prior negotiations with Chevron for the sale of the building and in anticipation for LTA’s assistance to Keiichi-Mar in getting the building leased, and for managing tenant improvement construction following the sale.

. The record reflects that Chevron threatened to cancel the PSA after it had made numerous inquiries regarding the deposit and being advised by Ms. Grissen that no deposit had been made.

. It is undisputed that, other than the $300,000 deposited with Stewart Title by LTA, no earnest money deposit was ever independently made by Keiichi-Mar.

. By judgment dated 23 March 2012, Stewart Title was relieved of any and all liability to any of the named parties for the money deposited into the registry of the court.

. The trial judge’s son is a practicing attorney at the law firm that represented Chevron in the negotiations for the sale of the Chevron building. According to LTA, once the trial judge realized her son’s law firm was potentially exposed to liability for damages arising out of the transaction, she should have re-cused herself. We note that even had LTA properly preserved the issue of recusal for appeal, we find no factual or legal grounds to support recusal in this case.