MAX N. TOBIAS, JR., Judge.
11 Prime Insurance Company (“Prime”), the plaintiff/appellant, appeals a summary judgment in favor of defendant/appellee, Imperial Fire and Casualty Insurance *673 Company (“Imperial”), in a case involving the taxicab insurance market in Louisiana, and particularly, New Orleans. After reviewing the record and applicable law, we reverse the summary judgment in Imperial’s favor and remand the matter to the trial court for further proceedings.
The facts as alleged by Prime are as follows: The focus of the underlying matter centers primarily around a class action lawsuit filed on 9 December 2002 in the 19th Judicial District Court for the Parish of East Baton Rouge (hereafter “the underlying suit”). At the time that suit was filed, only two companies sold taxicab insurance for the New Orleans market: Prime and Imperial.
The premise of the underlying suit was that Prime was liable to its policyholders because it sold non-compliant insurance policies to taxicab owners and drivers. The lawsuit alleged that Louisiana law, as found in La. R.S. 45:200.4 and 32:866(A), required that cab policies pay full coverage with zero deductible. | ¡¿However, the Prime policies contained a $500 self-insured retention (“S.I.R.”) provision, thereby violating the law. In addition, it was further alleged that the policies violated Louisiana law by requiring the deduction of defense costs. The fact that the policies were non-compliant was never disputed by Prime.
In fact, at the time the underlying suit was filed, Prime was already working with the Louisiana Department of Insurance (“DOI”) to correct the deficiencies, which was accomplished in mid-March 2003. Moreover, during the pendency of the underlying suit, the trial court unequivocally held that the non-compliant policies were automatically reformed, pursuant to Louisiana law. It is clear throughout the almost seven years that the underlying suit was prosecuted that no plaintiff — named or putative — had ever suffered any damage as a result of Prime’s policies. Moreover, Prime believed that Imperial and Gregory Porobil (“Porobil”) (co-defendants in the matter sub judice), allegedly acting in concert with others, filed and continued to prosecute the underlying suit, knowing there were no damages. This, Prime claims, was done in order to achieve an ulterior motive — to damage Prime’s insurance business in New Orleans.
The record reflects that Imperial and Porobil have a long history together. The owner of Imperial — J.E. Brignae (“Brig-nac”) — and Porobil have been friends for over thirty-five years. Porobil began handling Imperial’s legal business when it entered the Louisiana taxicab insurance market in the 1990s and has been its attorney since, managing an average of fifteen of Imperial’s taxi claims each year. In addition, Porobil owned, at all pertinent times, Excell Underwriters, Inc., which Rserved almost exclusively as Imperial’s taxicab insurance. agent. That relationship continued until 2011, when Brignae, and others, purchased Excell from Porobil.[1] Defendant, Gene Alleman (“Alleman”), and Poro-bil also had a close relationship, having been business partners prior to, and at all times during, the underlying suit. In December 2000, Porobil and Alleman started a taxicab dispatch service together — N.O. Transportation Group, L.L.C. (“NOTG”)— that also operated taxicabs servicing New Orleans under the trade names “White Fleet” and “Elk’s Elite.” In addition, Alleman created N.O. Elite Leasing, L.L.C. (“Elite”) around the same time, which, in turn, owned and operated a num *674 ber of taxicabs and had always insured its cabs with Excell, with the exception of the one-month period at issue in the underlying suit.
Within a year of going into business together, Alleman, allegedly of his own accord, took one of his taxicabs off Poro-bil’s Excell/Imperial insurance policy in order to purchase a month-long policy with Porobil’s competitor, Bennie Jefferson of Maximal Insurance. At the time, Maximal was Prime’s only insurance agent in New Orleans. Alleman testified that he made this move in order to save twenty-five dollars a month and to “stay competitive” in the taxicab operation business. Alle-man also testified that he knew that Maximal was Excell’s direct competitor.
During the one month of Maximal/Prime coverage, Alleman’s taxicab did not get into any accidents, and, therefore, was never exposed to any claim for |4damages or had the occasion to test the policy’s provisions. Nevertheless, after learning of the specifics of the policy, Porobil suggested that Alleman might want to file a class action suit against Prime. Porobil sent Alleman to Andre LaPlace (“LaPlace”), a Baton Rouge attorney, who, Porobil stated, knew more about class actions than he. LaPlace filed the underlying suit on the grounds that Alleman had heard that Prime tried to collect a deductible from another policyholder. The stated basis of the suit was that Prime had allegedly failed to comply with Louisiana’s full coverage requirement under the financial responsibility laws, because the policies of insurance issued by Prime to certain Louisiana taxicab drivers contained a $500 deductible/SIR and deduction of defense costs provisions. Despite the fact that those provisions had never been enforced against Alleman and/or Floyd Bergeron (“Bergeron”), another named plaintiff, the suit sought reimbursement of premium payments, S.I.R. payments, voidance of the insurance policies, attorney’s fees, and costs. At some point thereafter, Porobil enrolled as cocounsel in the underlying suit.
Throughout the pendency of the underlying suit, the class action plaintiffs produced no evidence that they had actually suffered damages. Only four plaintiffs were ever named: Alleman, Bergeron, Elite, and Montaster Girgis (“Girgis”).[2] The originally named plaintiffs were Alle-man, as representative for the insured policyholders, and Bergeron, as representative for third-party claimants. Neither was able to produce any evidence that they were in any way damaged by the Prime Ispolicies. Less than a year after filing the suit, Bergeron and the putative third-party claimants’ actions were dismissed after counsel for the plaintiffs represented to the court that there was no opposition to an Exception of No Cause of Action filed by another defendant to the matter. When Prime was finally able to depose Alleman in 2006, he admitted that he had absolutely no exposure to any third-party claims against him and never had the occasion to test the applicability of the S.I.R. or defense costs provisions. In fact, Alle-man knew of no one who had paid the S.I.R.
In addition, neither Alleman nor Berger-on had an attorney’s fee contract with their lawyers. Neither Alleman nor any of the other plaintiffs paid for any litigation expenses; Alleman had no idea who bore those costs. In his deposition, Porobil stated that he and LaPlace bore all the *675 costs of the proceedings.[3]
On 24 March 2005, Prime filed a motion for summary judgment to show that, prior to the filing of the underlying suit, Prime and the DOI had begun negotiations to correct any defects in the Prime policies. Within two months of the filing of the suit, Prime and the DOI had entered into an agreement that essentially mooted all claims brought in the lawsuit. This final agreement between Prime and the DOI was made known to the plaintiffs on numerous occasions through written discovery, depositions, and Prime’s 2005 motion for summary judgment. Despite | (¡their awareness of Prime’s agreement to correct all of its policies going forward and backward, the plaintiffs continued with their lawsuit.[4]
At the 22 May 2006 hearing on the Prime’s motion for summary judgment, the court found that its 11 April 2005 ruling that the policies violated Louisiana law needed clarification. The court explained, “[T]he auto polices of insurance issued that failed to meet the mandatory insurance requirements, including minimum limits are automatically reformed in accordance with the law.” (“[The S.I.R.] provisions are without legal effect and the policies were reformed as a matter of law.”) Thus, this holding meant that all of Prime’s policyholders who purchased the policies with S.I.R. and defense cost provisions had paid for entirely legal taxicab insurance.[5]
Nevertheless, Porobil continued to prosecute the claims by amending the suit two more times. On September 13, 2007, the fifth amended petition redefined the class action plaintiffs’ theories to add the claim of declaratory relief that the policies be reformed, even though the 2006 ruling held that the policies were automatically reformed. A year later, on 18 October 2008, the suit was amended for the sixth time to add Girgis as another class representative on the purported basis that he was harmed when Prime attempted to collect a $500 deductible from |7him after settling with a third-party claimant. The deductible was never paid by Girgis; thus, no damages were incurred by him.
Finally, on 17 February 2009, almost seven years after the underlying suit had been filed and after several requests for continuance, the plaintiffs’ motion for class certification was heard by the court. At the hearing, Prime presented an overwhelming amount of evidence that established, as already known to Porobil, that no plaintiff had ever been aggrieved and/or damaged. The plaintiffs offered no countervailing evidence or live witnesses to dispute Prime’s position. In the face of such *676 dispositive evidence in favor of Prime, the court ruled against certifying a class, reasoning that the plaintiffs had failed to establish the required “numerosity of plausible claims” in the absence of any economic damage. In support of its ruling, the court held that the “damage claims of the proposed class representatives [were] far from plausible,” and that no named or putative class member was financially damaged by the existence of the $500 S.I.R. language in the policy, as Alleman admitted long ago under oath.
After the class action petition was dismissed, Prime immediately filed a motion for summary judgment to dismiss the individual claims of the three remaining class representatives — Alleman, Elite, and Gir-gis; Prime’s motion for was unopposed.[6] The court, therefore, granted the motion and dismissed the claims of the purported class representatives with prejudice, by judgment dated 22 February 2010 in favor of Prime.
laOnce the underlying suit was dismissed, Prime filed the instant matter against Imperial, Porobil and his law firm, Alleman, and N.O. Elite, alleging malicious prosecution, conspiracy, restraint of trade, and a violation of the Louisiana Unfair Trade Practices Act (“LUTPA”). Once the depositions of the principal actors were taken, Imperial and Porobil filed separate motions for summary judgment; the trial court granted the motion filed by Imperial, but denied the motion filed by Porobil. Porobil has not sought appellate review of the denial of his motion.
Prime filed this appeal arguing that genuine issues of material fact exist concerning Imperial’s involvement in the underlying suit, thereby precluding summary judgment.
In its brief filed to this court, as well as in the court below, Imperial argues that Prime has absolutely no direct evidence to demonstrate that Imperial was involved in the underlying suit, either on its own or through Porobil or Alleman. It. contends that the depositions of the parties involved, including Porobil, Alleman, Brignac, and Prime’s CEO and chairman, Richard J. Lindsey, do not link Imperial to the underlying suit in any way. Thus, Imperial argues that the trial court correctly granted its motion for summary judgment and dismissed it from the instant lawsuit.
We review a summary judgment determination de novo, the same standard applied by the trial court in deciding the motion for summary judgment. Lingoni v. Hibernia National Bank, 09-0737, p. 4 (La.App. 4 Cir. 3/3/10), 33 So.3d 372, 375, writ denied, 10-0975 (La.5/28/10), 36 So.3d 255.
Prime has assigned four errors for our review, each of which addresses a cause of action asserted by it against Imperial. The most important one, whether a civil conspiracy existed between Porobil and Imperial, is discussed first.
The Louisiana Supreme Court has held that conspiracy by itself is not an actionable claim under Louisiana law. Crutcher-Tufts Resources, Inc. v. Tufts, 07-1556, p. 3 (La.App. 4 Cir. 9/17/08), 992 So.2d 1091, 1094 (citing Ross v. Conoco, Inc., 02-0299 (La.10/15/02), 828 So.2d 546). The actionable element of a conspiracy claim is not the conspiracy itself but rather the tort that the conspirators agree to perpetrate and actually commit in whole or in part. Ames v. Ohle, 11-1540, p. 11 (La.App. 4 Cir. 5/23/12), 97 So.3d 386, 393. Prime’s cause of action for civil conspiracy pled in its petition clearly identifies malicious prosecution, restraint of trade, and a *677 violation of LUTPA as the underlying torts that form the basis for the alleged conspiracy.
As we stated in Thomas v. North 40 Land Development, Inc., 04-0610, p. 22 (La.App. 4 Cir. 1/26/05), 894 So.2d 1160, 1174:
Under La. C.C. article 2324, “[h]e who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.” La. C.C. art. 2324(A). To establish a conspiracy, a plaintiff is required to provide, evidence of the requisite agreement between the parties. Guidry v. Bank of LaPlace, 94-1758, p. 9 (LaApp. 4 Cir. 9/15/95), 661 So.2d 1052, 1058. Stated otherwise, the plaintiff is required to establish a meeting of the minds or collusion between the parties for the purpose of committing wrongdoing. Id.
| inThe conspiracy action is “for damages caused by acts committed pursuant to a formed conspiracy, and all of the conspirators will be regarded as having assisted or encouraged the performance of those acts.” Chrysler Credit Corp. v. Whitney Nat’l Bank, 51 F.3d 553, 557 (5th Cir.1995). Proof of a conspiracy can be by “actual knowledge of both parties or overt actions with another, or can be inferred from the knowledge of the alleged co-conspirator of the impropriety of the actions taken by the other co-conspirator.” Stephens v. Bail Enforcement of Louisiana, 96-0809, p. 10 (La.App. 1 Cir. 2/14/97), 690 So.2d 124, 131. “The plaintiff must therefore prove an unlawful act and assistance or encouragement that amounts to a conspiracy. The assistance or encouragement must be of such quality and character that a jury would be permitted to infer from it an underlying agreement and act that is the essence of the conspiracy.” Chrysler Credit, 51 F.3d at 557. [Emphasis supplied.]
It is hornbook law that summary judgment is not a substitute for a trial on the merits, and is inappropriate for judicial determination of subjective facts, such as motive, intent, good faith, knowledge and malice; that calls for credibility determinations and the weighing of testimony. Stewart Title of Louisiana v. Chevron, U.S.A., Inc., 12-1369, p. 6 (La.App. 4 Cir. 3/27/13), 112 So.3d 949, 952. Similarly, a motion for summary judgment is rarely appropriate for the disposition of issues requiring a determination of the reasonableness of acts and conduct of parties under all the facts and circumstances of a case. See Greater Lafourche Port Com’n v. James Const. Group, LLC, 11-1548, p. 7 (La.App. 1 Cir. 9/21/12), 104 So.3d 84, 88. Whether a particular fact is in dispute can be seen only in light of the substantive law applicable to the case. Richard v. Hall, 03-1488, p. 4 (La.4/23/04), 874 So.2d 131, 137. As the Supreme Court has explained, a “genuine issue” is a “triable issue,” or one as to which reasonable persons could disagree. Champagne v. Ward, 03-3211, p. 5 (La.1/19/05), 893 So.2d 773, 777. A “material fact” is a fact, the existence or non-existence of which may be essential to a cause of action under the applicable theory of recovery. . Id.
Malicious prosecution requires proof of six elements and the lack of any one of these factors is fatal to such a claim. They are: (1) the commencement or continuance of an original criminal or civil judicial proceeding; (2) its legal causation by the present defendant against plaintiff who was defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; and (6) *678 damage conforming to legal standards resulting to plaintiff. McClanahan v. McClanahan, 09-182, p. 3 (La.App. 5 Cir. 10/13/09), 27 So.3d 862, 864, writ denied, 09-2455 (La.1/29/10), 25 So.3d 833 (citation omitted). Further, the action for malicious prosecution has always been applied only where there has been strict compliance with all essential elements. Id.
We find that Prime has stated a cause of action for malicious prosecution. In response to Imperial’s motion, Prime submitted sufficient evidence to raise a genuine issue of material fact as to whether probable cause existed to justify the continuation of the underlying suit, especially in light of the trial court’s May 2006 ruling.
LUTPA declares it unlawful to engage in “unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.” La. R.S. 51:1405 A. It also creates a right of action for any person who suffers any | ^ascertainable loss for a violation of the statute. La. R.S. 51:1409 A; Cheramie Servs. Inc. v. Shell Deepwater Production Inc., 09-1633, pp. 6-7 (La.4/23/10), 35 So.3d 1053, 1057. Claims under LUTPA are not limited to consumers and business competitors, but are available to any person who suffers any ascertainable loss as a result of violations of the statute. Hardy v. Easterling, 47,950, p. 13 (La.App. 2 Cir. 4/10/13), 113 So.3d 1178, 1187. Acts constituting unfair or deceptive trade practices are not specifically defined but are determined on a case-by-case basis. Johnson Const. Co. v. Shaffer, 46,999, p. 5 (La.App. 2 Cir. 2/29/12), 87 So.3d 203, 208; Tyler v. Rapid Cash, LLC, 40,656, p. 9 (La.App. 2 Cir. 5/17/06), 930 So.2d 1135, 1140. The Supreme Court explained:
LUTPA does not prohibit sound business practices, the exercise of permissible business judgment or appropriate free enterprise transactions. The statute does not forbid a business to do what everyone knows a business must do: make money. * * * Finally, the statute does not provide an alternate remedy for simple breaches of contract. There is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes.
Cheramie Servs. v. Shell Deepwater, p. 11, 35 So.3d at 1160, quoting Turner v. Purina Mills Inc., 989 F.2d 1419, 1422 (5th Cir.1993).
We also find that a LUTPA claim has been properly pled. There is evidence that the continuation of the underlying suit may have operated to remove Imperial’s main competitor from the New Orleans taxi cab insurance market. This type of behavior is exactly what the LUTPA seeks to prevent.
Both Porobil and Imperial stood to benefited from the underlying suit that prevented Prime from writing taxi cab policies in the Greater New Orleans area. 113Without Prime and/or Maximal, Porobil would be the only agent writing taxi cab insurance for Prime’s only competitor, thereby profiting from increased commissions. Of course, the benefit to Imperial is obvious.
Reading the record as a whole, we find genuine issues of material fact regarding Imperial’s part in the alleged conspiracy. We note that Porobil stated in his deposition that he most likely told Brignac about the class action lawsuit, a fact that was confirmed by Brignac. When asked why he would have told Brignac, Porobil testified that they talked back and forth about Prime. Despite this, Brignac testified that he was not kept abreast of the lawsuit.
At the time of the class action, Prime was Imperial’s only competitor in the New *679 Orleans taxicab insurance market. As such, we find that the following from Brig-nac’s deposition testimony raises a material issue of fact:
Greg mentioned to me that they had filed a class action suit. Not being an attorney, I didn’t even know what they were doing and couldn’t care less what they were doing at all.
There was also testimony in the underlying lawsuit from Ron Musser, who worked for the DOI and served as Assistant Commissioner of the Office of Financial Solvency, who stated that he learned of the class action lawsuit from Brignac, the owner of Imperial. Brignac, however, could not recall the specifics of the conversation with Mr. Musser.
Imperial argues that Mr. Musser already knew about the illegal policies because Porobil had already filed a complaint against Prime with the DOI on 22 November 2002. However, if Brignac “couldn’t care less” about the lawsuit, why would he call Mr. Musser to tell him about it? We find'Brignac’s testimony [ 1 Regarding Imperial’s interest and/or involvement in the underlying suit contradictory, thereby creating a genuine issue of material fact.
Credibility of a witness is a question of fact. In determining a motion for summary judgment, the court must assume that all affiants are credible. Hutchinson v. Knights of Columbus, Council No. 5747, 03-1533, p. 8 (La.2/20/04), 866 So.2d 228, 234. Facts are “material” if they are determinative of the outcome of the dispute. Penalber v. Blount, 550 So.2d 577, 583 (La.1989). If reasonable minds could differ as to an issue of material fact, summary judgment is improper. Woodland Properties, LLC v. New Orleans Sewerage and Water Board, 10-0331, p. 4 (La.App. 4 Cir. 9/29/10), 49 So.3d 443, 445.
We find that Imperial’s involvement, or lack thereof, in the underlying class action suit is a question of fact. We agree that Prime’s evidence is far from overwhelming, however, we view this as a case to be determined by a trier of fact that is capable of determining the credibility of the witnesses.
For the reasons stated above, we reverse the summary judgment of the trial court and remand the matter for further proceedings consistent with this opinion.

REVERSED; REMANDED.

. During his deposition, Porobil downplayed the fact that Imperial's owner bought his company, testifying instead that Francis Heit-meier, a former state senator, and others he did not know, made the purchase.

. Girgis was added as a party-plaintiff very late in the litigation. Alleman was neither familiar with the man nor knew he had been added as a plaintiff to the underlying suit.

. Porobil testified that he and LaPlace planned to recoup their costs and attorney's fees from the award to the class. However, once class certification was denied, no reimbursement and award was possible. Prime's CEO and chairman, Richard J. Lindsey, testified that he spent approximately $350,000 in attorney’s fees and costs, defending the case. He also testified that when the underlying suit was filed, Prime’s business in Louisiana had grown to $1.7 million. As a result of the suit, it dropped to $12,000 in premiums.

. Alleman stated that he was not aware that in late 2002 or early 2003, Prime had worked out a reformation of its policy with the DOI such that the $500 S.I.R. deductible would not be applied to third-party issues. Alleman stated that if such was the fact, he would have wanted the lawsuit dismissed.

.Porobil testified in his deposition that, after the trial court's 2006 ruling, he thought on a couple of occasions that they should dismiss the lawsuit. He was not asked why he didn’t do so. When asked if he ever approached Prime to settle the matter, Porobil stated “I don’t think Prime ever wanted to resolve it.” Alleman was unaware that the lawsuit continued for almost seven years from the date of filing; he thought it had been dismissed.

. Alleman was unaware of this as well.