| TAMLA PIERRE AND CHRIS PIERRE | * | NO. 2021-CA-0320 |
|---|---|---|
| | * | |
| VERSUS | | COURT OF APPEAL |
| | * | |
| MYRIAD GENETICS, INC. AND GREGORY ABEL | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

* * * * * * *

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2019-07027, DIVISION "M"
Honorable Paulette R. Irons, Judge
* * * * * *
**Judge Terri F. Love**
* * * * * *
(Court composed of Judge Terri F. Love, Judge Joy Cossich Lobrano, Judge
Tiffany Gautier Chase)

**LOBRANO, J., CONCURS IN THE RESULT**

Lawrence J. Centola, III
Jason Z. Landry
Scott R. Bickford
MARTZELL, BICKFORD & CENTOLA
338 Lafayette Street
New Orleans, LA 70130


COUNSEL FOR PLAINTIFF/APPELLANT


Crystal E. Domreis
Michael C. Mims
BRADLEY MURCHISON KELLY & SHEA LLC
1100 Poydras Street, Ste. 2700
New Orleans, LA 70163-2700


COUNSEL FOR DEFENDANT/APPELLEE

*TFL*

*TGC*

In this negligence suit, Tamla Pierre, a nurse practitioner, and Christopher Taylor, her husband, sued Myriad Genetics, Inc. ("Myriad") and Gregory Abel, a former employee of Myriad, for negligence. Myriad is a molecular diagnostic company. Ms. Pierre owns a women's clinic and employed Myriad's genetic testing products for her patients. Mr. Abel was a sales representative for Myriad. Ms. Pierre's mother suffered from breast cancer and in 2016, Ms. Pierre chose to undergo a Myriad genetic test. The results of that test were negative for any clinically significant genetic mutations, but did identify one variant of "uncertain significance." Ms. Pierre alleges that Mr. Abel informed her that she and her mother had the same gene, and indicated that Ms. Pierre had an 80-90% chance of developing breast cancer. Ms. Pierre claims that Mr. Abel also shared that his wife had the same gene and that she chose to undergo a prophylactic mastectomy.

Ms. Pierre consulted a doctor and claims that she decided, based on Mr. Abel's representations to her, to undergo a double mastectomy. Approximately two years after that surgery, Myriad informed Ms. Pierre that the variant was reclassified from a "variant of uncertain significance" to a variant of "no clinical

1

significance." Three months later, Ms. Pierre and Mr. Taylor filed suit, seeking damages as a result of Myriad's incorrect classification of the genetic variant and Mr. Abel's misinformation regarding her risk of cancer. Myriad and Mr. Abel filed a motion for summary judgment, arguing that the suit was not timely filed because any alleged negligence occurred over a year prior to the plaintiffs' suit. Following discovery, and a hearing on the matter, the trial court granted summary judgment, holding that the suit had prescribed on its face and that no genuine issue of material fact existed. Ms. Pierre and Mr. Taylor now appeal this judgment.

Upon review, we find that the appellants presented a genuine issue of material fact as to when they acquired constructive notice of the cause of action. Mr. Abel's alleged misinformation could reasonably have been interpreted as additional information providing further context to Ms. Pierre's test results in such a manner that would not excite the appellants' attention, put them on guard, or call for inquiry. The trial court's judgment granting the motion for summary judgment is reversed and remanded for further proceedings consistent with this opinion.

**FACTUAL AND PROCEDURAL HISTORY**

Ms. Pierre holds a Bachelor's degree from Loyola University, a Master's degree in Nursing from the University of South Alabama, and is licensed as a nurse practitioner. Through additional licensures, Ms. Pierre is authorized to write prescriptions for controlled substances for her patients. In 2008, Ms. Pierre opened a women's health clinic in New Orleans. In 2016, she began ordering Myriad genetic tests for her patients at the practice. Ms. Pierre typically received her

patients' test results, explained the results to them, and then referred patients to a higher discipline for more guidance, such as an oncologist or obstetrician-gynecologist. Ms. Pierre has a family history of cancer, including her mother, who survived breast cancer, her aunt, who also had breast cancer, and her brother, who died of thyroid cancer. In 2012, Ms. Pierre's mother underwent genetic testing with Myriad. On December 29, 2016, Ms. Pierre underwent a Myriad genetic test herself to discover her likelihood of developing cancer.

On February 14, 2017, Myriad issued the test results in a report to Ms. Pierre. The results read, in relevant part: "NEGATIVE - NO CLINICALLY SIGNIFICANT MUTATION IDENTIFIED." This text was at the top of the page, highlighted in green. Additional text in this section read: "Note: 'CLINICALLY SIGNIFICANT,' as defined in this report, is a genetic change that is associated with the potential to alter medical intervention." Underneath this text, the results stated that a variant of uncertain significance ("VUS") was identified. The text further stated that "uncertain clinical significance" meant that "[t]here are currently insufficient data to determine if these variants cause increased cancer risks." The report explained:

> Details About Non-Clinically Significant Variants: All individuals carry DNA changes (i.e., variants), and most variants do not increase an individual's risk of cancer or other diseases. When identified, variants of uncertain significance (VUS) are reported. Likely benign variants (Favor Polymorphisms) and benign variants (Polymorphisms) are not reported and available data indicate that these variants most likely do not cause increased cancer risk. **Present evidence does not suggest that non-clinically significant variant findings be used to modify patient medical management beyond what is indicated by the personal and family history and any other clinically significant findings.**

3

Variant Classification: Myriad's myVision™ Variant Classification Program performs ongoing evaluations of variant classifications, in certain cases, healthcare providers may be contacted for more clinical information or to arrange family testing to aid in variant classification. **When new evidence about a variant is identified and determined to result in clinical significance and management change, that information will automatically be made available to the healthcare provider through an amended report.**

(Emphasis added).

The report additionally advised that "[a]ny discussion of medical management options is for general information purposes only and does not constitute a recommendation. While genetic testing and medical society guidelines provide important and useful information, medical management decisions should be made in consultation between each patient and his or her healthcare provider." Lastly, the report closed with a statement to "contact Myriad Medical Services at 1-800-469-7423 X 3850 to discuss any questions regarding this result."

Ms. Pierre alleged that at some point between February 14, 2017, and before March 31, 2017, Mr. Abel contacted her to discuss her results. Ms. Pierre alleged that Mr. Abel received her test results before she did herself. During the discussion, Mr. Abel allegedly disclosed to Ms. Pierre that she had "the same gene" as her mother, a breast cancer survivor, and as his own wife, who chose to undergo a mastectomy. Ms. Pierre claimed that Mr. Abel then showed her an additional chart to indicate that her risk of developing cancer was 80-90%. Ms. Pierre testified that as a result of his alarming disclosures, she believed that she would develop cancer, and would need medical care from an oncologist.

4

On March 31, 2017, Ms. Pierre consulted with Dr. Alfred Colfry, an oncologist whom she had referred patients to in her practice. Dr. Colfry noted that Ms. Pierre presented with a strong family history of cancer, including her mother, brother, and aunt. Dr. Colfry's notes described Ms. Pierre as a high-risk patient with a significant probability of developing breast cancer. Dr. Colfry also noted that he and Ms. Pierre discussed that it was "odd" that she tested positive for the same VUS as her mother, who had breast cancer. In his notes, Dr. Colfry wrote that Ms. Pierre was "very motivated" to pursue a prophylactic bilateral mastectomy. On May 8, 2017, Ms. Pierre underwent a bilateral mastectomy and breast reconstruction surgery. She alleged that she suffered numerous surgical complications following that treatment, but still believed it was necessary to save her life.

Approximately two years later, on April 23, 2019, Myriad issued an amended report to Ms. Pierre re-stating her negative result of no clinically significant mutations, but also providing new information regarding the variant previously identified. The variant was now reclassified as a variant of no clinical significance. The amended report explained that while Ms. Pierre still carried the variant, it had been determined not to be a pathogenic mutation. Ms. Pierre alleged that when she received this amended report, she began to question Mr. Abel's representations to her and the necessity of the bilateral mastectomy.

Shortly thereafter, Ms. Pierre and her husband filed a negligence suit against Myriad and Mr. Abel, claiming that she suffered damages as a result of Myriad's

scientifically incorrect classification of the genetic variant and Mr. Abel's misinformation regarding her risk of cancer. Mr. Taylor brought a claim for a lack of consortium. Myriad and Mr. Abel filed a motion for partial summary judgment seeking dismissal of the variant misclassification claim. The trial court held a hearing on the matter and granted that motion. Myriad and Mr. Abel filed a motion for summary judgment on prescription, arguing that the negligence alleged by Ms. Pierre took place over a year prior to her filing suit. Ms. Pierre and Mr. Taylor filed opposition to the motion, stating that the suit was timely filed because Ms. Pierre was unaware that the shared VUS did not cause breast cancer, and thus did not know that Abel had misled her, until she received the 2019 amended report from Myriad. The trial court granted summary judgment to Myriad and Mr. Abel during a hearing on the motion, finding that the suit was prescribed on its face and that no genuine issue of material fact existed. It is from this judgment that Ms. Pierre and Mr. Taylor now appeal.

**DISCUSSION**

*Standard of Review*

In instances where a party pleads prescription by way of a motion for summary judgment, appellate courts review the resulting judgment *de novo*, analyzing the same criteria relied upon by the trial court in determining the appropriateness of summary judgment. *Hogg v. Chevron USA, Inc.*, 09-2632, p. 6 (La. 7/6/10), 45 So. 3d 991, 997 (citing *Schroeder v. Bd. of Supervisors of Louisiana State Univ.*, 591 So. 2d 342 (La.1991)). "[F]actual

6

inferences reasonably drawn from the evidence must be construed in favor of the party opposing the motion, and all doubt must be resolved in the opponent's favor." *M.R. Pittman Grp., L.L.C. v. Plaquemines Parish Gov't*, 15-0860, p. 11, 182 So. 3d 312, 320 (citing *Citron v. Gentilly Carnival Club, Inc.*, 14-1096, p. 12 (La. App. 4 Cir. 4/15/15), 165 So. 3d 304, 312). "In contrast to a trial judge's role when ruling on an exception of prescription, a trial judge cannot make credibility determinations on a motion for summary judgment." *M.R. Pittman Grp., L.L.C.*, 15-0860, p. 11, 182 So. 3d at 320 (citing *Independent Fire Ins. Co. v. Sunbeam Corp.*, 99-2181, 99-2257, p. 16 (La. 2/29/00), 755 So. 2d 226, 236). "Similarly, when ruling on a motion for summary judgment a trial judge cannot consider the merits, evaluate testimony, or weigh evidence." *M.R. Pittman Grp., L.L.C.*, 15-0860, p. 11, 182 So. 3d at 320 (citing *Suire v. Lafayette City-Parish Consol. Gov't*, 04-1459, 04-1460, 04-1466, p. 11 (La. 4/12/05), 907 So. 2d 37, 48).

The burden of proving that a claim has prescribed falls upon the party pleading prescription. *M.R. Pittman Grp., L.L.C.*, 15-0860, p. 9, 182 So. 3d at 319 (citing *Ansardi v. Louisiana Citizens Property Ins. Co.*, 11-1717, 12-0166, p. 21 (La. App. 4 Cir. 3/1/13), 111 So. 3d 460, 472). When prescription is raised on a motion for summary judgment, "the movant is required to prove … that there is no genuine material factual issue in dispute regarding the date upon which the plaintiffs acquired actual or constructive knowledge of the damage sufficient to commence the running of prescription." *Hogg*, 09-2632, pp. 7-8, 45 So. 3d at 998 (citing *Labbe Service Garage, Inc. v. LBM Distributors, Inc.*, 94-1043, p. 10 (La.

7

App. 3 Cir. 2/1/95), 650 So. 2d 824, 829). However, if a claim is prescribed on its face, the burden of proof shifts to the opponent to demonstrate why the claim has not prescribed. *M.R. Pittman Grp., L.L.C.*, 15-0860, p. 9, 182 So. 3d at 319 (citing *Williams v. Sewerage & Water Bd. of New Orleans*, 611 So. 2d 1383, 1386 (La. 1993)). If the opponent to a motion for summary judgment alleges *contra non valentem* to defeat the motion, that party "must demonstrate that genuine issues of material fact exist relating to one or more of the four categories of *contra non valentem*." *M.R. Pittman Grp., L.L.C.*, 15-0860, p. 10, 182 So. 3d at 319 (citing *ASP Enterprises, Inc. v. Guillory*, 08-2235, pp. 15-16 (La. App. 1 Cir. 9/11/09), 22 So. 3d 964, 974). A genuine issue is "one as to which reasonable persons could disagree" and a material fact is defined as "a fact, the existence or non-existence of which may be essential to a cause of action under the applicable theory of recovery." *M.R. Pittman Grp., L.L.C.*, 15-0860, p. 9, 182 So. 3d at 318-19 (citing *Champagne v. Ward*, 03-3211, p. 5 (La. 1/19/05), 893 So. 2d 773, 777).

Summary judgment "is rarely appropriate for the disposition of issues requiring a determination of the reasonableness of acts and conduct of parties under all the facts and circumstances of a case." *Prime Ins. Co. v. Imperial Fire & Cas. Ins. Co.*, 14-0323, p. 10 (La. App. 4 Cir. 10/1/14), 151 So. 3d 670, 677 (citing *Greater Lafourche Port Comm'n v. James Const. Group, LLC*, 11-1548, p. 7 (La. App. 1 Cir. 9/21/12), 104 So. 3d 84, 88). However, "summary judgment is appropriate when all the relevant facts are marshalled before the court, the marshalled facts are undisputed, and the only issue is the ultimate conclusion to be

drawn from those facts." *Smith v. Our Lady of the Lake Hospital, Inc.*, 93-2512, p. 29 (La. 7/5/94), 639 So. 2d 730, 752.

*Assignment of Error*

The appellants assert that the trial court erred in finding that the claims are prescribed, arguing that the record evidence creates genuine issues of material fact as to when Ms. Pierre gained knowledge sufficient to trigger the running of prescription.

Pursuant to La. C.C. art. 3492, "[d]elictual actions are subject to a liberative prescription of one year … from the day injury or damage is sustained." Prescription statutes are "strictly construed against prescription and in favor of the claim sought to be extinguished by it." *Bailey v. Khoury*, 04-0620, p. 9 (La. 1/20/05), 891 So. 2d 1268, 1275. The doctrine of *contra non valentem agere non currit* recognizes that "prescription does not run against a person who could not bring his suit." *Nathan v. Carter*, 372 So. 2d 560, 561 (La. 1979). *Contra non valentem* is only applied in "exceptional circumstances," if one of these four situations exist:

> (1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action;
> (2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting;
> (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; or
> (4) where the cause of action is neither known nor reasonably knowable by the plaintiff even though plaintiff's ignorance is not induced by the defendant.

*Renfroe v. State ex rel. Dept. of Transp. and Development,* 01-1646 (La. 2/26/02), 809 So. 2d 947, 953 (citing La. C.C. art. 3467, Official Revision Comment (d)*; State ex rel. Div. of Admin. v. McInnis Bros. Const.*, 97-0742 (La. 10/21/97), 701 So. 2d 937, 940); *Marin v. Exxon Mobil Corp.*, 09-2368, p. 12 (La. 10/19/10), 48 So. 3d 234, 245).

As the appellants' suit prescribed on its face, the appellants bear the burden of proving that the suit nonetheless remains viable. The appellants assert that the fourth category of *contra non valentem*, referred to as the discovery rule, applies because the cause of action was not known, nor reasonably knowable by them, until Ms. Pierre received the 2019 amended report. *Marin*, 09-2368, p. 12, 48 So. 3d at 245.

"A prescriptive period will begin to run even if the injured party does not have actual knowledge of facts that would entitle him to bring a suit as long as there is constructive knowledge of same." *Campo v. Correa*, 01-2707, p. 12 (La. 6/21/02), 828 So. 2d 502, 510. Constructive knowledge is defined as "whatever notice is enough to excite attention and put the injured party on guard and call for inquiry." *Id.*, 01-2707, p. 12, 828 So. 2d at 510-11. That notice is held to include "knowledge or notice of everything to which a reasonable inquiry may lead." *Id.*, 01-2707, p. 12, 828 So. 2d at 511. "[I]information or knowledge as ought to reasonably put the alleged victim on inquiry is sufficient to start running of prescription." *Id.* (citing *Ledet v. Miller*, 459 So. 2d 202 (La. App. 3 Cir. 1984); *Bayonne v. Hartford Ins. Co.*, 353 So. 2d 1051 (La. App. 2 Cir. 1977); *Opelousas*

*Gen. Hosp. v. Guillory*, 429 So. 2d 550 (La. App. 3 Cir. 1983)). "The ultimate issue is the reasonableness of the tort victim's action or inaction, in light of his education, intelligence and the nature of the defendant's conduct*." McGuire v. Mosley Rogers Title Co. L.L.C.*, 43,554, p. 8 (La. App. 2 Cir. 9/17/08), 997 So. 2d 23, 29 (citing *Campo*, 01-2707, p. 12, 828 So. 2d at 511).

Accepting as true the allegations against Mr. Abel, the question presented is whether the appellants have presented a genuine issue of material fact as to when they knew or should have known of the potential cause of action. To answer such a question, this Court is called upon to assess when it would have been reasonable for Ms. Pierre to discover the alleged negligence, in light of her education, intelligence, and the nature of the appellees' conduct. *McGuire*, 43,554, p. 8, 997 So. 2d at 29 (citing *Campo*, 01-2707, p. 12, 828 So. 2d at 511). Such an analysis is generally ill-suited for summary judgment procedures. *Prime Ins. Co.*, 14-0323, p. 10, 151 So. 3d at 677 (citing *Greater Lafourche Port Comm'n*, 11-1548, p. 7, 104 So. 3d at 88).

The appellants argue that the scarcity of scientific literature on the gene variant signifies that nothing short of the appellees' 2019 reclassification could have put the appellants on notice that they were the victims of negligence. The appellants further assert that no investigation of their own would have revealed that the variant did not increase Ms. Pierre's risk of cancer. The appellees counter that there were are a number of instances in which Ms. Pierre was in receipt of information conveying that a VUS is not known to increase cancer risks, in direct

11

contradiction to the alleged statements of Mr. Abel. The appellees argue that these contradictions sufficed to put the appellants on notice of the need for inquiry into the matter.

First, the appellees point to the original test result itself, which defined a VUS as a gene variant with insufficient data to determine increased cancer risks. The appellees argue that this definition contradicted the statements of Mr. Abel, who allegedly asserted that the presence of the variant denoted a dramatically increased cancer risk for Ms. Pierre. The 2017 report also stated that present evidence "does not suggest that non-clinically significant variant findings be used to modify patient medical management beyond what is indicated by the personal and family history and any other clinically significant findings." Yet Mr. Abel intimated that major, life-altering surgery in the form of a prophylactic bilateral mastectomy should be pursued.

The appellees contend that these contradictions necessarily alerted the appellants to the need for inquiry. However, the appellants allege that Mr. Abel proactively reached out to Ms. Pierre to discuss her results, and that he was in receipt of her test results before she was. During the discussion, he allegedly disclosed private information about Ms. Pierre's mother's results, as well as his wife's results. The appellants argue that doing so, while simultaneously informing Ms. Pierre that her risk of cancer had dramatically increased, created the appearance of a Myriad employee sharing confidential, off-the-books information that the appellants otherwise would not have access to. Additionally, the

appellants do not contend that Mr. Abel stated that the benign result in the 2017 report was wrong. Instead, the appellants contend that Mr. Abel conveyed additional information that gave further context to Ms. Pierre's results, on the basis of his position as a company insider.

The appellees also point to emails that Ms. Pierre received from Mr. Abel and from Myriad. One email, received from Mr. Abel on February 2, 2017, stated that in pre-test counseling, the two had discussed the meaning of a test result showing a VUS. The email stated that he explained that a VUS means that a genetic change was identified in a gene, but it is unclear if this change causes an increase in cancer risk normally associated with decisions for a patient. Another email sent to Ms. Pierre, on May 11, 2017, with a subject line of "Dr. Pierre, learn more about VUS results in this Myriad myRisk Case Study," stated:

> Variation in the human genome is normal, with new genetic changes discovered every day. That's why variants of uncertain significance (VUS) are expected in genetic testing. A VUS is a change in the genetic sequence for which association with disease risk is unclear. An uncertain genetic test result can be confusing to patients and make it challenging for health care providers to counsel patients on the appropriate course of management.

The appellees argue that these written instances contradict Mr. Abel's verbal assertions and should have excited the appellants' alarm. However, the appellants argue that Mr. Abel's specific verbal assertions as to Ms. Pierre's risk of cancer purported to eliminate the "unknown" element of Ms. Pierre's VUS. The appellants aver that Ms. Pierre could receive these emails and understand that although a VUS can be perfectly normal, hers was not. Furthermore, the appellants assert that when Mr. Abel informed Ms. Pierre that she shared that VUS

13

with her mother, a breast cancer survivor, it augmented her belief that their particular VUS was not benign.

The appellees additionally emphasize an in-person meeting regarding VUS results on April 13, 2017, between Ms. Pierre and Samantha Penney Douglass, a Myriad Regional Medical Specialist. Ms. Douglass documented the meeting in a contemporaneous work note and submitted an affidavit stating that the two had discussed that a VUS is a genetic change identified in a gene where inconclusive evidence makes it unclear if this change causes an increase in cancer risk. In her affidavit, Ms. Douglass wrote that they discussed that VUS results are not used to make medical management decisions for a patient. The appellants argue that similar to the broad statements in the emails cited by the appellees, this meeting discussed only the general meaning of VUS results. The appellants maintain that these instances gave Ms. Pierre no reason to believe there was a contradiction such that she may have been the victim of negligence in the context of Mr. Abel's definitive, clarifying information on her distinct results.

The appellees cite *Hogg v. Chevron USA, Inc.*, 09-2632, 09-2635 (La. 7/6/10), 45 So. 3d 991 to argue that these examples mandate a finding that constructive notice occurred. In *Hogg*, the Hoggs were property owners in Ruston, Louisiana who brought a claim for damages against neighboring landowners due to environmental contamination of their land. *Id.*, 09-2632, 09-2635, p. 1, 45 So. 3d at 994. The neighbors owned a gas station that had leaked gasoline onto the Hoggs' property. *Id.* In 2001, the Louisiana Department of Environmental Quality

("LDEQ") informed the Hoggs of environmental contamination in the vicinity of the gas station and warned that there was a possibility of gasoline migrating from the station to the Hoggs' property. *Id.*, 09-2632, 09-2635, pp. 2-3, 45 So. 3d at 995. In 2002, LDEQ sent another letter to the Hoggs stating that environmental tests had been conducted on the Hoggs' property and, based on those test results, LDEQ recommended that the Hoggs limit the time spent in the area tested. *Id.*, 09-2632, 09-2635, p. 3, 45 So. 3d at 995. In 2006, the Hoggs were contacted by a company contracted by LDEQ requesting permission to access the Hoggs' property for purposes of conducting remediation on the property. *Id.*

Within a year of the 2006 correspondence, the Hoggs sued the owners of the property with the gas station. *Id.* The Hoggs argued that it was not until that final correspondence that they had definitive knowledge of contamination. *Id.*, 09-2632, 09-2635, p. 4, 45 So. 3d at 996. In finding that the claims had prescribed, the Court explained that the Hoggs had constructive notice of the potential claim in 2002 because the 2002 letter provided a "clear indication that matters had advanced beyond mere investigation of the area to corrective action to remedy damage caused by the contamination." *Id.*, 09-2632, 09-2635, p. 12, 45 So. 3d at 1000-01. The Court stated that even if the earlier letters did not definitively conclude that contamination occurred, they did "provide sufficient information to excite attention and put plaintiffs on guard and call for inquiry." *Id.*, 09-2632, 09-2635, p. 13, 45 So. 3d at 1001.

*Hogg* is distinguishable from the present circumstances. In the instant case, the appellants had no explicit warning of potential damage done to them, as the *Hoggs* did via the 2001 and 2002 letters. The appellants were only aware that Ms. Pierre received additional information from Mr. Abel that supplemented her test results. Ms. Pierre was informed by the appellees that her variant was classified as one of uncertain significance, but was nonetheless assured that there was significance to the fact that her breast cancer-surviving mother shared that variant. Even if Ms. Pierre had investigated her specific variant further, it is possible she would not have found scientific information that could have refuted Mr. Abel's claims. Unlike in *Hogg*, where the plaintiffs received multiple alerts as to potential damage, the only alert that Ms. Pierre received that controverted Mr. Abel's specific misinformation was the 2019 amended report reclassifying the variant as one of no clinical significance. Upon receiving that notice, Ms. Pierre was put on guard, inquired into the matter, and promptly filed suit within three months.

The appellees further cite the applicability of *Prevo v. State ex rel. Dep't of Pub. Safety & Corr. Div. of Prob. & Parole,* 15-0823 (La. 11/20/15), 187 So. 3d 395. In *Prevo*, a supervised releasee sued the Department of Public Safety and Corrections alleging that she was coerced by her probation officer to register as a sex offender, even though she knew that she was not required to do so. *Id.*, 15-0823, p. 3, 187 So. 3d at 397. The Supreme Court assessed the third category of *contra non valentem* and, in the course of that analysis, examined the reasonableness of the plaintiff's actions. The Court found that it was unreasonable

for the releasee to delay seeking recourse for the harm she knew she had suffered, even in light of her limited education and mental health challenges. *Id.*, 15-0823, pp. 8-9, 187 So. 3d at 400. *Prevo* is distinct from the facts at hand. In this case, unlike in *Prevo*, the appellants were not definitively aware that the advice they received was incorrect. Moreover, Ms. Pierre's advanced education may not have assisted the appellants in testing the veracity of Mr. Abel's targeted representations on the variant since the available science, pioneered by Myriad, provided only uncertain information on the matter.

In summary, the information Mr. Abel conveyed, as a company employee, could reasonably have been interpreted as an enhancement of Ms. Pierre's written results, rather than notice sufficient to excite her attention of possible wrongdoing. Due to the inherent uncertainty of scientific literature regarding genetic variants of uncertain significance, it may have been impossible for Ms. Pierre, even equipped as she was with an advanced education and professional health practice, to conduct a fruitful inquiry into the matter. Upon construing all factual inferences reasonably drawn from the evidence in the appellants' favor, we find that the appellants raised a genuine issue of material fact as to when Ms. Pierre acquired constructive notice sufficient to trigger the running of prescription.

**CONCLUSION**

For the reasons assigned, we hold that the trial court erred in finding that the appellants' suit was prescribed and that no genuine issue of material fact existed. Accordingly, we reverse the judgment of the trial court and remand the case to the

17

trial court for proceedings consistent with this opinion.

**REVERSED AND REMANDED**